BENJAMIN W. BULL (AZ Bar No. 009940)
TRAVIS C. BARHAM* (AZ Bar No. 024867)
Alliance Defense Fund
15333 N. Pima Road, Suite 165
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028—facsimile
bbull@telladf.org
tbarham@telladf.org

DAVID A. FRENCH* (TN Bar No. 16692; KY Bar No. 86986)
Alliance Defense Fund
12 Public Square
Columbia, Tennessee 38401
(931) 490-0591
(931) 490-7989—facsimile
dfrench@telladf.org

DAVID J. HACKER (CA Bar No. 249272; IL Bar No. 6283022)
Alliance Defense Fund
101 Parkshore Drive, Suite 100
Folsom, California 95630
(916) 932-2850
(916) 932-2851—facsimile
dhacker@telladf.org

Attorneys for Plaintiffs College Republicans at San Francisco State University,
Leigh Wolf and Trent Downes
* *Pro hac vice* admission

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| **COLLEGE REPUBLICANS AT SAN FRANCISCO STATE UNIVERSITY**, et al., | Case No. C-07-3542-WDB |
| Plaintiffs, | **Hon. Wayne D. Brazil** |
| v. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; NOTICE OF MOTION; and MEMORANDUM OF POINTS AND AUTHORITIES** |
| **CHARLES B. REED**, et al., | |
| Defendants. | **Hearing date: October 31, 2007** |
| | **Hearing time: 1:30 p.m.** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................iii

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ...........................1

STATEMENT OF RELIEF REQUESTED .........................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................1

ISSUE PRESENTED ...............................................................................1

STATEMENT OF RELEVANT FACTS...........................................................1

SUMMARY OF ARGUMENT ...................................................................4

ARGUMENT ......................................................................................6

I.      LIKELIHOOD OF SUCCESS IS STRONG ON MULTIPLE CONSTITUTIONAL
        GROUNDS........................................................................................6

        A.      BECAUSE IT REQUIRES BEHAVIOR IN ACCORD WITH SFSU GOALS AND
                PRINCIPLES, PROHIBITS INCIVILITY, INTIMIDATION, AND HARASSMENT
                WITHOUT DEFINITION, AND CONDITIONS THE FREEDOM OF SPEECH ON THE
                SUBJECTIVE REACTIONS OF LISTENERS, SFSU'S SPEECH CODE IS OVERBROAD. ........7

                1.      The speech code bans expression based on listeners' reactions.....................9

                2.      The speech code fails to require a showing of severity or pervasiveness
                        before permitting punishment. ........................................................11

                3.      The dictionary definitions of the speech code's prohibitions
                        demonstrate its overbreadth. .........................................................12

                4.      Defendants applied the speech code to chill College Republicans'
                        expression on campus. ................................................................13

**B.**     **BECAUSE IT FAILS TO PROVIDE ADEQUATE NOTICE, AUTHORIZES ARBITRARY AND DISCRIMINATORY ENFORCEMENT, AND CHILLS FREE SPEECH, SFSU'S SPEECH CODE IS UNCONSTITUTIONALLY VAGUE.** ........................................................14

**II.     PLAINTIFFS AND ALL STUDENTS AT THE CALIFORNIA STATE UNIVERSITY ARE SUFFERING IRREPARABLE INJURY.**..........................................16

**III.     INJUNCTION WILL SERVE THE PUBLIC INTEREST.** ...................................................17

**CONCLUSION** ...........................................................................................................................17

ii

1

## TABLE OF AUTHORITIES

2

## Cases

3

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ........................................6

4

*Armstrong v. Ellington*, 312 F. Supp. 1119 (W.D. Tenn. 1970) ............................................10

5

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) ..................................................7, 11, 13

6

*Bachellar v. Maryland*, 397 U.S. 564 (1970) ......................................................................10

7

*Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003) ......................5, 10, 16, 17

8

*Booher v. Bd. of Regents, Northern Ky. Univ.*, No. 96-135, 1998 U.S. Dist. LEXIS 11404
    (E.D. Ky. 1998)...............................................................................................................5

9

10

*Church of the Am. Knights of the Ku Klux Klan v. City of Erie*, 99 F. Supp. 2d 583
    (W.D. Pa. 2000) ............................................................................................................10

11

12

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ...........................................................14, 15

13

*City of Houston v. Hill*, 482 U.S. 451 (1987) .................................................................6, 13

14

*Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968 (9th Cir. 1996).........................................5

15

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926) ...............................................................14

16

*Corry v. Leland Stanford Junior Univ.*, No. 740309 (Cal. Super. Ct. Feb. 27, 1995).............5

17

*Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997)....................17

18

*Dambrot v. Cent. Mich. Univ.*, 839 F. Supp. 477 (E.D. Mich. 1993)........................5, 13, 15, 16

19

20

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999)..................................................12

21

*DeJohn v. Temple Univ.*, No. 06-778 (E.D. Pa. Mar. 21, 2007) ............................................5

22

*Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989) ......................................5, 11, 13

23

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................................................16

24

*Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007)....................................................................7

25

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ............................................11

26

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) .....................................................14

27

28

iii

1

*Gatto v. County of Sonoma*, 120 Cal. Rptr. 2d 550 (Cal. App. 1st Dist. 2002) ........................10, 11, 15

2

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...............................................................14

3

*Gregory v. City of Chicago*, 394 U.S. 111 (1969) ..................................................................6

4

*Healy v. James*, 408 U.S. 169 (1972) ...................................................................................7

5

6

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) .................................................................7

7

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993) ........11

8

*Keyishian v. Bd. of Regents of the Univ. of N.Y.*, 385 U.S. 589 (1967)..............................4, 17

9

*Kolender v. Lawson*, 461 U.S. 352 (1983)...........................................................................14

10

*Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1994) ........................................................7

11

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ............................8

12

13

*Milwaukee Mobilization for Survival v. Milwaukee County Park Comm'n*, 477 F. Supp. 1210
    (E.D. Wis. 1979) .........................................................................................................11

14

*NAACP v. Button*, 371 U.S. 415 (1963)...........................................................................7, 14

15

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ..................................................10

16

*Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997) .................................................14

17

*Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667 (1973)...................................7

18

19

*Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867 (9th Cir. 2000) ......................6

20

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ..........................................................7, 13, 14

21

*Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004)...........................................5, 11

22

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) ..................7

23

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002) ...................6, 16, 17

24

25

*San Diego Comm. Against Registration & the Draft v. Governing Bd. of Grossmont Union
    High Sch. Dist.*, 790 F.2d 1471 (9th Cir. 1986) .........................................................16

26

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) ......................5, 8, 9, 11, 13

27

*Shelton v. Tucker*, 364 U.S. 479, 487 (1960)........................................................................7

28

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957)...................................................................4

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243 (3d Cir. 2002)...................16, 17

*Texas v. Johnson*, 491 U.S. 397 (1989) ...........................................................................8, 13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)................................8, 11

*United States v. Eichman*, 496 U.S. 310 (1990) ................................................................7

*UWM Post, Inc. v. Bd. of Regents of Univ. of Wis. Sys.*, 774 F. Supp. 1163 (E.D. Wis. 1991)....5, 10, 15

*Viacom Int'l, Inc. v. FCC*, 828 F. Supp. 741 (N.D. Ca. 1993) ..........................................16

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ...........14

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)..............................................17

*Widmar v. Vincent*, 454 U.S. 263 (1981) ..........................................................................7

**Statutes and Regulations**

Cal. Code Regs. tit. 5, § 41301 (2007)............................................................................1, 2

Cal. Educ. Code § 89030 (2007).......................................................................................2

**Other Authorities**

Alan Charles Kors & Harvey Silverglate, *The Shadow University: The Betrayal of Liberty on America's Campuses* (Harper, 1999)...................................................................4

*The Merriam-Webster Dictionary* 342 (1997) ...................................................................12

*Random House Webster's Unabridged Dictionary* 1000 (2d ed. 1998)................................12

v

1    **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

2    PLEASE TAKE NOTICE that on October 31, 2007 at 1:30 p.m., in Courtroom 4 of the United

3    States District Court for the Northern District of California, located at 1301 Clay Street, 3rd Floor,

4    Oakland, California 94612, Plaintiffs College Republicans at San Francisco State University, Leigh

5    Wolf, and Trent Downes will move the Court for a preliminary injunction against Defendants Charles

6    B. Reed, Robert A. Corrigan, J. E. Saffold, and Joey Greenwell.  This Motion is brought pursuant to

7    Federal Rule of Civil Procedure 65(a) on the grounds that Plaintiffs are likely to succeed on the merits

8    of this case, they will suffer irreparable harm absent injunctive relief, and such relief is in the public's

9    interest.  The grounds for this Motion are more fully set forth below in the Memorandum of Points and

10    Authorities and in Plaintiffs' Verified Complaint.  Plaintiffs request waiver of any bond requirement

11    because enjoining these policies will not financially affect Defendants.

12    **STATEMENT OF RELIEF REQUESTED**

13    Plaintiffs seek to preliminarily enjoin the Defendants from enforcing the California State

14    University's Standards for Student Conduct, Cal. Code Regs. tit. 5, § 41301(a) & (b)(7) (2007), and

15    the Student Group Misconduct section of San Francisco State University's Student Organization

16    Handbook.

17    **MEMORANDUM OF POINTS AND AUTHORITIES**

18    **ISSUE PRESENTED**

19    Whether the Standards for Student Conduct, Cal. Code Regs. tit. 5, § 41301(a) & (b)(7), and

20    the Student Organization Handbook "Student Group Misconduct" policies are facially and as-applied

21    vague and overbroad in violation of Plaintiffs' First and Fourteenth Amendment rights to freedom of

22    expression and due process of law.

23    **STATEMENT OF RELEVANT FACTS**

24    The California State University (CSU) regulates expressive student conduct on its many

25    campuses through a system-wide regulation titled the Standards for Student Conduct ("Student

26    Code"), Cal. Code Regs. tit. 5, § 41301 (2007).  The Trustees of the California State University system

27    created and promulgated § 41301 pursuant to their statutory authority.  (*See* Cal. Educ. Code § 89030

28

1

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - C-07-3542-WDB

(2007); First Am. Compl. ("Compl.") ¶ 23.)  SFSU publishes the Student Code in its annual *Bulletin*, which contains policies and procedure for SFSU students.  (Compl. Ex. C.)  San Francisco State University (SFSU or University) officials regulate expressive student conduct on campus, in part, by implementing the Student Code.  (Compl. ¶ 24.)  This policy will be referred to as SFSU's Student Code, though it applies to all CSU campuses.  (*Id.* ¶ 23.)  SFSU also enforces two, local speech-restrictive policies:  a sexual harassment policy (not the subject of this Motion but at issue in this case) and the Student Organization Handbook.  Together, these three documents regulate the bounds of permissible student and student organization expression on campus like that of Plaintiffs College Republicans at San Francisco State University, Leigh Wolf and Trent Downes (collectively herein "College Republicans").

The Student Code is enforced at SFSU by Defendants Corrigan, Saffold and Greenwell, and requires students to abide by certain "responsibilities."  Students must "*be civil* to one another and to others in the campus community . . . "  (Cal. Code Regs. tit. 5, § 41301(a); Compl. ¶ 24; Ex. C at 43) (emphasis added).  The Student Code also prohibits "Unacceptable Student Behaviors," including "intimidation, [and] harassment."  (*Id.* § 41301(b)(7); Compl. ¶ 25; Ex. C at 43.)  The Student Code does not define "civil," "intimidation," or "harassment."  (Compl. Ex. C.)  Violation of the Student Code may result in disciplinary action, including sanctions.  (*Id.* § 41301(c); Compl. Ex. C at 45.)

SFSU's Division of Student Affairs, under the supervision of Defendant Saffold, operates the Office of Student Programs and Leadership Development (OSPLD).  (Compl. ¶¶ 16, 17, 19.) Defendant Greenwell is the current director of OSPLD.  (*Id.* ¶ 19.)  OSPLD registers SFSU student organizations, promulgates the Student Organization Handbook, and advises students regarding SFSU policies.  (*Id.* ¶ 20.)  OSPLD's Student Organization Handbook lists several guidelines that student organizations must follow to maintain official recognition on campus.  SFSU's Student Organization Handbook directs students to review and comply with the Student Code.  (Compl. Ex. A at 16).  The Student Organization Handbook also contains a section entitled "Student Group Misconduct," which holds student organizations collectively accountable for individual actions "when the behavior is

2

1   inconsistent with SF State *goals*, *principles* and policies." (Compl. ¶ 22; Ex. A) (emphasis added).

2   SFSU's "goals" and "principles" are not defined. (Compl. ¶ 22.)

3   OSPLD can refer complaints of student organization misconduct to SFSU's Student

4   Organization Hearing Panel ("SOHP"). (*Id*. ¶ 32.) Students and student organizations at SFSU are

5   subject to discipline for violating the Student Code, the Student Organization Handbook, or any other

6   University policy, or local, state or federal laws. (*Id*. ¶ 33.) Possible discipline includes, but is not

7   limited to, "a letter of warning, censure, probation, suspension, or revocation of the organization's

8   recognition." (*Id*.)

9   Defendants used the preceding policies to "investigate" College Republicans after one student

10  complained about the expressive content of College Republicans' Anti-Terrorism Rally in October

11  2006. (*Id*. ¶¶ 48, 50, 55.) The Rally involved a political protest in which College Republicans stepped

12  on the flags of terrorist organizations. (*Id*. ¶¶ 39, 41.) The complaint claimed that the College

13  Republicans' Rally amounted to "actions of incivility" that "incited violence," and created a "hostile

14  environment." (*Id*. ¶ 48.) The student cited the Student Code as the basis for his complaint. (*Id*.)

15  From October 2006 until March 2007, Defendants Corrigan and Saffold permitted, and Defendant

16  Greenwell instructed, OSPLD to investigate whether College Republicans had violated the Student

17  Code or other policies by hosting the Rally. (*Id*. ¶¶ 38, 48, 61, 64.)

18  Instead of recognizing that College Republicans' Rally was constitutionally protected

19  expression and dismissing the student's complaint as frivolous, Defendants found "probable cause"

20  that Plaintiffs had violated university policies, launched a five-month investigation (which required

21  Plaintiffs to invest hundreds of hours of time in defense), and publicly excoriated Plaintiffs for

22  allegedly desecrating the name "of Allah." (*Id*. ¶ 62; Ex. J.) A formal Student Organization Hearing

23  Panel (SOHP) hearing took place on March 9, 2007. (*Id*. ¶¶ 50, 55, 62-64.) Members of the SOHP

24  included student-members of SFSU's student government organization, which had voted unanimously

25  to condemn the Rally and pledged to remove College Republicans' student activity fee funding if it

26  was convicted of violating University policy. (*Id*. ¶¶ 53, 58.) Defendants used the SOHP hearing to

27  bully College Republicans and chill their future expressive activities on campus. (*Id*. ¶¶ 68-74.)

28

3

1    Plaintiffs filed this facial and as-applied challenge to Defendants' speech code on July 9, 2007.

2    (Docket No. 1.)

3    <u>**SUMMARY OF ARGUMENT**</u>

4        "The essentiality of freedom in the community of American universities is almost self-evident.

5    . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new

6    maturity and understanding; otherwise our civilization will stagnate and die." *Keyishian v. Bd. of*

7    *Regents of the Univ. of N.Y.*, 385 U.S. 589, 603 (1967) (quoting *Sweezy v. New Hampshire*, 354 U.S.

8    234 (1957)).  Written almost forty years ago, these words remain a clarion call for a particular vision

9    of the American public university – as a marketplace of ideas, a place where students learn not what to

10   think but how to think, a place where our civilization transmits the essential values of liberty and free

11   inquiry.  Unfortunately, however, this vision of liberty has been under sustained assault.

12       For more than twenty years, universities have systematically attempted to marginalize and

13   exclude students and student organizations that are outside the political mainstream of campus.[1]

14   Perhaps the most pernicious and persistent of the various methods of campus censorship is the "speech

15   code."   A speech code is the common term for campus regulations that prohibit speech the

16   Constitution protects.   Designed to broadly prohibit so-called "offensive" or "intimidating"

17   communications, these codes have chilled free speech at campuses from coast to coast.  Facially vague

18   and overbroad, they deter untold thousands of students from speaking freely on critical issues of race,

19   gender, sexuality, and religion.  Arbitrarily enforced, they tend to become weapons of the dominant

20   political culture, wielded against dissenters in an effort to replace the "marketplace of ideas" with an

21   ideological monopoly.

22       Crucially, from the inception of the "speech code" in the 1980s, courts have uniformly rejected

23   them, both facially and as-applied.  *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir.

24   2001) (Alito, J.) (striking down overbroad antiharassment regulations in Pennsylvania public high

25   _____

26   [1] For a comprehensive review of universities' national assault on the fundamental liberties, *see* Alan
     Charles Kors & Harvey Silverglate, *The Shadow University: The Betrayal of Liberty on America's*

27   *Campuses* (Harper, 1999).  Written by two civil libertarians, the book chronicles the widespread
     violation of university students' basic rights to free speech, free association, due process, and free

28   exercise of religion.

4

school); *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968 (9th Cir. 1996) (finding college sexual harassment policy vague as-applied to professor's speech); *DeJohn v. Temple Univ.*, No. 06-778 (E.D. Pa. Mar. 21, 2007) (slip opinion) (permanently enjoining enforcement of overbroad university sexual harassment policy); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 872 (N.D. Tex. 2004) (enjoining overbroad university speech code that prohibited "threats, insults, epithets, ridicule, or personal attacks" by students); *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003) (enjoining enforcement of overbroad "cultural diversity and racism" policy statement); *Booher v. Bd. of Regents, N. Kentucky Univ.*, No. 96-135, 1998 U.S. Dist. LEXIS 11404, *1 (E.D. Ky. July 22, 1998) (finding Northern Kentucky University's "sexual harassment policy facially invalid under the First Amendment due to vagueness and overbreadth"); *Dambrot v. Cent. Mich. Univ.*, 839 F. Supp. 477 (E.D. Mich. 1993) (enjoining overbroad and vague "discriminatory harassment" policy); *UWM Post, Inc. v. Bd. of Regents of Univ. of Wis. Sys.*, 774 F. Supp. 1163 (E.D. Wis. 1991) (ruling that policy prohibiting discriminatory epithets was overbroad and vague); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989) (enjoining overbroad and vague discrimination and harassment speech code); *Corry v. Leland Stanford Junior Univ.*, No. 740309 (Cal. Super. Ct. Feb. 27, 1995) (slip opinion) (finding private university's speech policies unconstitutionally overbroad under California's Leonard Law).

This combination of circuit and district precedent should have ended speech codes at universities across the nation, yet they persist. In fact, SFSU (and CSU) maintains a speech code that uses similar language to those struck down in *Saxe*, *Shippensburg*, and *UWM Post*. By requiring students to behave consistent with SFSU's "goals [and] principles" and "be civil" to one another, and by prohibiting "intimidation" and "harassment" without defining these terms, Defendants have enacted a speech-restrictive policy that mirrors policies invalidated by courts across the country.

Further, Defendants applied the speech code to chill College Republicans' protected expression on campus. Defendants' Student Code and Student Organization Handbook unconstitutionally chill free expression on SFSU's campus, stand in direct defiance of the mission of the university as a marketplace of ideas, and are invalid both facially and as applied under the United States Constitution.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - C-07-3542-WDB

Plaintiffs seek immediate injunctive relief to protect not only their fundamental First Amendment rights but the rights of every student at SFSU.

## ARGUMENT

Defendants' speech code violates the constitutional rights of each and every student at SFSU (and in the CSU system).  Defendants' speech code is unconstitutional because it (1) conditions free speech rights on the subjective response of listeners, and (2) purports to regulate core protected speech without defining the nature or extent of the regulation.

College Republicans are entitled to a preliminary injunction enjoining Defendants from enforcing the speech code outlined above until the Court issues a final ruling on its constitutionality.  Preliminary injunctive relief is available when a party demonstrates either:  (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  "Each of these two formulations requires an examination of both the potential merits of the asserted claims and the harm or hardships faced by the parties."  *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."  *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000).

## I.    LIKELIHOOD OF SUCCESS IS STRONG ON MULTIPLE CONSTITUTIONAL GROUNDS.

College Republicans are likely to succeed on the merits of this case because Defendants' speech code is facially and as-applied invalid under the First and Fourteenth Amendments to the United States Constitution.  Freedom of expression – an essential ingredient of liberty – must be jealously guarded, particularly when the controversial nature of the speaker's message has stirred emotions and triggered an attempt to suppress that message.  *See Gregory v. City of Chicago*, 394 U.S. 111 (1969).  Popular speech and pleasant words have little need for constitutional protection.  *City of Houston v. Hill*, 482 U.S. 451, 462 n.11 (1987).  The true test of the right to free speech is the protection afforded to unpopular, unpleasant, disturbing, or even despised speech.  *See Madsen v.*

6

*Women's Health Ctr.*, 512 U.S. 753, 773-74 (1994) (pro-life expression); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (cross-burning); *United States v. Eichman*, 496 U.S. 310 (1990) (flag burning); *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) (scurrilous attacks on public figure).

These constitutional norms extend with equal force to the campuses of public universities. *Widmar v. Vincent*, 454 U.S. 263, 268-69 (1981); *Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007). The Supreme Court regards university campuses as the "marketplace of ideas," and has stated that "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)); *see also Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) ("the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'"). Presumably, Defendants recognize this principle: "Nothing in this [Student] Code may conflict with Education Code Section 66301 that prohibits disciplinary action against students based on behavior protected by the First Amendment." (Compl. Ex. B at 24.) But other portions of the Student Code and Student Organization Handbook regulate student expression on the basis of the "motivating ideology or the opinion or perspective of the speaker," which constitutes viewpoint discrimination – "an egregious form of content discrimination" – that is never allowed. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). College Republicans wish to engage in free expression at SFSU, but fear punishment under SFSU's overbroad and vague speech code.

> **A.    Because it Requires Behavior in Accord with SFSU Goals and Principles, Prohibits Incivility, Intimidation, and Harassment Without Definition, and Conditions the Freedom of Speech on the Subjective Reactions of Listeners, SFSU's Speech Code Is Overbroad.**

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002); *see NAACP v. Button*, 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."). "A regulation is unconstitutional on its face on overbreadth grounds where there is a 'likelihood that the statute's very existence will inhibit free expression' by 'inhibiting the speech of third parties who are

7

1   not before the Court.'"  *Saxe*, 240 F.3d at 214 (quoting *Members of City Council v. Taxpayers for*

2   *Vincent*, 466 U.S. 789, 799 (1984)).  Defendants prohibit protected expression by requiring students to

3   abide by all SFSU "*goals*, *principles* and policies" and prohibiting incivility, intimidation, and

4   harassment, without definition.

5          The most relevant case on point is *Saxe v. State College Area School District*, 240 F.3d 200 (3d

6   Cir. 2001).  In *Saxe*, the Third Circuit struck down a public high school's anti-harassment policy that

7   prohibited "verbal or physical conduct based on one's actual or perceived race, religion, color, national

8   origin, gender, sexual orientation, disability, or other personal characteristics, and which has the

9   purpose or effect of substantially interfering with a student's educational performance or creating an

10  intimidating, hostile or offensive environment."  *Id*. at 202.  The policy said harassment "can include

11  unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual. . . .

12  "  *Id*. at 202-03.  Judge (now Justice) Alito, writing for the Court, held that the policy was substantially

13  overbroad because it "reaches any speech that interferes or is intended to interfere with educational

14  performance or that creates or is intended to create a hostile environment."  *Id*. at 216. The court

15  declared the policy overbroad for two reasons.

16         First, the policy conditioned free speech on the subjective reaction of listeners, because speech

17  that was "unwelcome" or "offensive" could not be so defined without reference to the listener.

18  Moreover, the policy punished not only speech that actually caused disruption, but also speech that

19  merely intended to do so.  *Id*.  "No one would suggest that a school could constitutionally ban 'any

20  unwelcome verbal . . . conduct which offends . . . an individual because of' some enumerated personal

21  characteristics.'"  *Id*. at 215.  Justice Alito noted that "[t]he Supreme Court has held time and again,

22  both within and outside of the school context, that the mere fact that someone might take offense at the

23  content of speech is not sufficient justification for prohibiting it."  *Id*.; *see also Texas v. Johnson*, 491

24  U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the

25  government may not prohibit the expression of an idea simply because society finds the idea offensive

26  or disagreeable."); *Tinker v. Des Moines Indep. Cmty. Sch. Dist*., 393 U.S. 503, 509 (1969) (holding a

27

28

8

school may not prohibit speech based on the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint").

Second, the speech code—which banned harassing speech that "creates an intimidating, hostile or offensive environment" and "intrudes upon the rights of others"—could not be rendered constitutional pursuant to a reasonable limiting instruction. *Saxe*, 240 F.3d at 216-17.

> The precise scope of *Tinker's* 'interference with the rights of others' language is unclear; at least one court has opined that it covers only independently tortious speech like libel, slander or intentional infliction of emotional distress. . . . In any case, it is certainly not enough that the speech is merely offensive to some listener. . . . Because the Policy's 'hostile environment' prong does not, on its face, require any threshold showing of severity or pervasiveness, it could conceivably be applied to cover any speech about some enumerated personal characteristics, the content of which offends someone.

*Id*. at 217 (internal citations omitted). The policy banned clearly protected speech, by restricting "*any* speech that interferes or is *intended* to interfere with educational performance or that creates or is *intended* to create a hostile environment." *Id*. at 216 (emphasis added). Under *Saxe* and similar cases across the country, Defendants' Student Code and Student Group Misconduct policy are overbroad.

### 1.    The speech code bans expression based on listeners' reactions.

The Student Group Misconduct policy in the Student Organization Handbook requires students to comply with SFSU "goals, [and] principles. . . ." The Student Code mandates that students "be civil" to one another and prohibits "intimidation, [and] harassment" of university community members. Defendants fail to define the scope and meaning of these prohibitions. As socially unacceptable as this expression may be, when Defendants list these prohibitions without definition, they prohibit constitutionally protected speech. Many courts have recognized the overbreadth of prohibiting expression that is "intimidating" and "harassing," because those words focus on the listener's reactions, and without definition they are unequally applied by campus administrators.

In *Saxe*, the policy at issue prohibited "harassing" speech that "creat[es] an intimidating, hostile or offensive environment." 240 F.3d at 217. The Third Circuit held that the policy was facially overbroad because it could be applied to any speech that offends someone, and it did not require any showing of severity or pervasiveness. *Id*. The policy prohibited "core" political speech, which is at the heart of what the First Amendment protects. *Id*. SFSU's Student Code and Student

9

1   Group Misconduct policy, like the speech code overturned in *Saxe*, fail constitutional scrutiny on their

2   face because they ban forms of expression without definition, which conditions punishment on the

3   subjective reaction of listeners.  So-called "heckler's vetoes" like this are unconstitutional.  *NAACP v.*

4   *Claiborne Hardware Co.*, 458 U.S. 886 (1982); *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970).

5          Likewise, in *Bair v. Shippensburg University*, the university's policy directed students to

6   communicate in a manner that "does not . . . *intimidate*, or harm another." 280 F. Supp. 2d at 370

7   (emphasis added).  The court held that "intimidate" focuses upon listeners' reactions to speech and

8   that government may not prohibit speech based on listeners' reactions.  *Id*. at 370-71.  The court found

9   the policy overbroad and enjoined its enforcement.  Crucially, the court enjoined a university policy

10  requiring all students to mirror "the principles of [Shippensburg University's] ideals . . . "  *Id*. at 372.

11  Like *Shippensburg*, SFSU's speech code requires that students act in accordance with SFSU's goals

12  and principles, "precepts which fail to pass constitutional muster" on overbreadth grounds.  *Id*.  In fact,

13  the court found that the speech code in *Shippensburg* would be unlawful even if enacted at a high

14  school (following *Saxe*) and was thus unquestionably unconstitutional at a public university, where

15  free speech protections are far more extensive.  *Id*. at 369.

16         In *UWM Post, Inc. v. Board of Regents of the University of Wisconsin System*, the university

17  prohibited comments that "create an *intimidating*, hostile or demeaning environment for education."

18  774 F. Supp. 1163, 1172 (E.D. Wis. 1991) (emphasis added).  The court found the policy overbroad

19  because "intimidate" was not a fighting word and encompassed protected speech.  *Id*.  Similarly, in

20  *Armstrong v. Ellington*, 312 F. Supp. 1119, 1123 (W.D. Tenn. 1970), a Tennessee law prohibiting

21  traveling "for the purpose of . . . *intimidating* citizens" was overbroad because "intimidating" was not

22  clearly defined in the statute and when left alone punished otherwise protected speech.  (Emphasis

23  added).  In *Church of the American Knights of the Ku Klux Klan v. City of Erie*, 99 F. Supp. 2d 583,

24  586 (W.D. Pa. 2000), a city ordinance prohibited the wearing of a mask in public with the "intent to

25  *intimidate*, threaten, abuse or harass any other person." (Emphasis added).  The ordinance did not

26  define "intimidate."  The court concluded that the use of "intimidate" rendered the law overbroad

27  because the meaning of this word includes constitutionally protected speech.  *Id*.; *see Gatto v. County*

28

10

*of Sonoma*, 120 Cal. Rptr. 2d 550, 574-75 (Cal. App. 1st Dist. 2002) (finding dress code that prohibited "intimidating" clothing to be overbroad).

Because words like "goals," "principles," "civil," "intimidation," and "harassment" are by their very nature subjective and imprecise, enforcement of Defendants' speech code necessarily depends on the reactions of listeners. The government may not prohibit speech based solely on the emotive impact that offensive content may have on a listener. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *see also Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993) (holding university's punishment of fraternity for "ugly woman contest" violated students' right to free expression); *Doe v. Univ. of Mich.*, 721 F. Supp. at 863 (striking down university speech code because it proscribed offensive speech based on listeners' reactions).

Further, any SFSU community member has the power to define these prohibitions on a case by case basis, leading to multiple interpretations and unequal enforcement. Unbridled discretion in enforcement leads to a chilling effect on speech. "[T]he overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Free Speech Coal.*, 535 U.S. at 255. Unequal enforcement of the Student Code is most dangerous to students, who enter college with the expectation that they can freely express their ideas without fear of university censorship. *Roberts*, 346 F. Supp. 2d at 872. Enacting regulations that attempt to purge society of unwelcome words is not the proper role of government. *Milwaukee Mobilization for Survival v. Milwaukee County Park Comm'n*, 477 F. Supp. 1210, 1219 (E.D. Wis. 1979).

### 2.    The speech code fails to require a showing of severity or pervasiveness before permitting punishment.

The Student Code is also facially overbroad because it fails to require a threshold showing of severity or pervasiveness before expression can be deemed "uncivil," "intimidation" or "harassment." *See Saxe*, 240 F.3d at 216-17. This ignores *Tinker's* requirement that schools must reasonably believe that speech will cause actual, material disruption before prohibiting it. *Tinker*, 393 U.S. at 508; *Saxe*, 240 F.3d at 217. In a secondary school context—not to mention a university context where the

11

Constitution demands *less* regulation of speech—the Supreme Court has said that to constitute unprotected speech, harassment must be "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 651 (1999). The face of the Student Code fails to require this heightened standard. Without requiring a showing of severity or pervasiveness, a single act of "uncivil," "intimidating," or "harassing" behavior by a student, however subjective and minute, may result in punishment.

      **3.**     **The dictionary definitions of the speech code's prohibitions demonstrate its overbreadth.**

Further, the dictionary definitions of the Student Code's words also illustrate their overbreadth. "Intimidate" is defined as: "1. to make timid; fill with fear. 2. to overawe or cow, as through the force of personality or by superior display of wealth, talent, etc. 3. to force into or deter from some action by inducing fear." *Random House Webster's Unabridged Dictionary* 1000 (2d ed. 1998). Defendants cannot prohibit students from attempts to show a "superior display of talent" on campus, but that is what their revised policy does, as written. "Harass" is defined as: "1. exhaust; fatigue; 2. to worry and impede by repeated raids; 3. to annoy continually." *The Merriam-Webster Dictionary* 342 (1997). "Civil" is defined as: "2. courteous, polite." *Id.* at 149. Two conscientious students who look up these words in two different dictionaries would find different definitions. Without precise definition, these words can include whatever an SFSU administrator decides.[2]

Like the policies at issue in *Saxe* and these other cases, SFSU's Student Code and Student Group Misconduct policy prohibit "core" protected speech. Much, if not most, expression that people would deem "civil" or even "intimidating" is nonetheless entirely constitutionally protected. Much passionate political advocacy is not conducted in a manner that most would consider "civil," but that advocacy nonetheless lies at the heart of what the First Amendment protects. Not only does this

---

[2] Or whatever an administrator on any CSU campus decides. The size of the CSU system, with campuses throughout California, enable administrators at San Diego State University to have different definitions of "civil," "intimidation" and "harassment" from that of administrators at SFSU.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - C-07-3542-WDB

policy, on its face, chill protected political expression by prohibiting broad swaths of speech, but it was actually used by Defendants in an effort to silence Plaintiffs' political expression.

### 4. Defendants applied the speech code to chill College Republicans' expression on campus.

If there is any doubt about the facial overbreadth of the speech code, one need look no further than how Defendants applied these policies to College Republicans. Defendants investigated College Republicans for five months during the 2006-2007 academic year, after one student complained that the Anti-Terrorism Rally was an "action of incivility." Yet, College Republicans' flag desecration was undoubtedly protected expression. *See Texas v. Johnson*, 491 U.S. 397 (1989). The student's complaint involved nothing more than ideological disagreement and hurt feelings. Courts have long held that the government cannot ban hurt feelings or insulting and offensive expression, yet SFSU pressed forward undeterred. *See City of Houston*, 482 U.S. at 462 n.11 (noting "if absolute assurance of tranquility is required, we may as well forget about free speech") (citations omitted); *Dambrot*, 839 F. Supp. 477 (holding unconstitutional a speech code that banned verbal and nonverbal behavior that created an intimidating, hostile or offensive environment).

So why did SFSU investigate? The only answer is that they investigated because the breadth of the policies allowed them to do so. "Although [College Republicans] was not sanctioned over the allegations of [incivility], the fact remains that [Defendants] . . . saw no First Amendment problem in forcing the student[s] to a hearing to answer for allegedly [uncivil] statements made" during a political rally. *Doe v. Univ. of Mich.*, 721 F. Supp. at 865. "[T]here is no indication that had the hearing panel convicted rather than acquitted the student[s], the University would have interceded to protect the interests of academic freedom and freedom of speech." *Id.*

"[T]here is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or that denigrate religious beliefs." *Saxe*, 240 F.3d at 206; s*ee also Free Speech Coal.*, 535 U.S. at 245 ("It is also well established that speech may not be prohibited because it concerns subjects offending our sensibilities); *R.A.V.*, 505 U.S. 377 (striking down hate-speech ordinance prohibiting "fighting words" that aroused "anger, alarm or resentment in others on the basis of race, color, creed,

13

religion or gender"). SFSU cannot ban hurt feelings. The marketplace of ideas cannot exist without freedom, and freedom carries with it the risk of offense. Has there ever in history been a thinker, leader, or philosopher who advanced our civilization without deeply offending the status quo? Defendants' overbroad Student Code and Student Group Misconduct policy must be enjoined.

> **B.    Because it Fails to Provide Adequate Notice, Authorizes Arbitrary and Discriminatory Enforcement, and Chills Free Speech, SFSU's Speech Code Is Unconstitutionally Vague.**

Defendant's speech code is unconstitutionally vague for three reasons: (1) it denies students fair notice of the standard of conduct to which they are held accountable; (2) it permits the unrestricted enforcement of the code against any SFSU community member, thereby inviting arbitrary, discriminatory and overzealous enforcement; and (3) it chills the exercise of First Amendment freedoms. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998).

Regulations and policies are void for vagueness when persons "of common intelligence must necessarily guess at [their] meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926). Vague statutes or policies are unconstitutional because they "fail to provide fair warning of prohibited conduct," and they authorize and encourage arbitrary and discriminatory enforcement because they do not establish minimal guidelines to govern their enforcement. *Morales*, 527 U.S. at 56; *Kolender v. Lawson*, 461 U.S. 352, 358 (1983); *Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997). "In a facial vagueness challenge, the ordinance need not be vague in all applications if it reaches a 'substantial amount of constitutionally protected conduct.'" *Nunez*, 114 F.3d at 940 (citing *Kolender*, 461 U.S. at 359 n.8). When First Amendment freedoms are at stake, "an even greater degree of specificity and clarity of laws is required." *Foti*, 146 F.3d at 638; *accord NAACP v. Button*, 371 U.S. 415, 432-33 (1963); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982); *Nunez*, 114 F.3d at 940.

The plain language of Defendants' speech code does not provide fair notice of prohibited conduct. The Student Code states that students must "be civil" to one another and not engage in "intimidation" or "harassment." The Student Group Misconduct policy requires students to act in

14

accordance with SFSU "goals" and "principles." These prohibitions lead to numerous interpretations. What actions are civil and uncivil? What kind of expression is sufficient to warrant punishment as intimidation? What does it mean to harass another person? What are SFSU's goals and principles? "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Morales*, 527 U.S. at 58 (citation omitted). These terms "require subjective reference in order to define them; the meanings of these terms are as vastly divergent as are individual tastes and personalities." *Dambrot*, 839 F. Supp. at 484.

Several courts have found policies prohibiting this kind of expression to be unconstitutionally vague. In *UWM Post*, 774 F. Supp. at 1172, the university prohibited comments that "create an intimidating, hostile or demeaning environment for education." The court found the policy failed on vagueness grounds because it did not contain a definition of "intimidating" and court was unable to render it constitutional based on a limiting instruction. In *Gatto v. County of Sonoma*, 120 Cal. Rptr. 2d 550, 573 (Cal. App. 1st Dist. 2002), the County Fair prohibited "apparel or accessories intended to provoke, offend or intimidate others . . . " The court found the policy vague because "[a] great deal of the apparel and accessories celebrated in contemporary fashion magazines can fairly be described as provocative and/or *intimidating*;" thus, citizens would not know if their clothing violated the policy. *Id*. at 575. Further, a requirement that students "be civil," refrain from "harassment" and obey unspecified "goals" and "principles" is no clearer than a policy that prohibits "offensive" and "negative' comments. *See Dambrot*, 839 F. Supp. 477 (holding university speech code unconstitutionally vague because it prohibited "negative" and "offensive" comments).

The speech code's terms are not self-defining. Left undefined, Defendants can use the speech code to silence disfavored expression, as they did when they investigated College Republicans for allegedly "desecrating" the "name of Allah" by stepping on a flag—a protected activity. Government policies regulating speech must be drawn with more precision. Because the University's policies encourage students to report when they believe another student or student organization behaves outside SFSU's "goals, [and] principles," or violates the prohibition on incivility, "intimidation," and/or "harassment," a lack of precision can lead directly to chilled speech as students inform on one

15

another whenever they feel subjectively "intimidated" or that someone has been "uncivil." Deprived of even minimal guidelines by which to spot and report so-called incivility, Defendants' speech code "leads to certain kinds of offensive conduct being restricted while allowing other personally offensive conduct to go unrestrained, because for the definitions of its terms [the speech code] depends on the viewpoint" of any SFSU student who reports "incivility." *Dambrot*, 839 F. Supp. at 484. Reliance on the subjective whims of community members leads to arbitrary and discriminatory enforcement and causes students to self-censor their speech for fear of punishment.

Defendants' Student Code and Student Group Misconduct policy are unconstitutionally vague and should be enjoined.

## II.    PLAINTIFFS AND ALL STUDENTS AT THE CALIFORNIA STATE UNIVERSITY ARE SUFFERING IRREPARABLE INJURY.

SFSU's facially unconstitutional speech code violates College Republicans' First Amendment rights and is causing ongoing, irreparable harm to the College Republicans (and to every CSU student) based on both past and future applications. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."); *Shippensburg*, 280 F. Supp. 2d at 372-73 (granting preliminary injunction to plaintiffs because speech code was unconstitutional and chilled their and all students' speech). "'Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim.'" *Sammartano*, 303 F.3d at 973 (citing *San Diego Comm. Against Registration & the Draft v. Governing Bd. of Grossmont Union High Sch. Dist.*, 790 F.2d 1471 (9th Cir. 1986)); *see also Viacom Int'l, Inc. v. FCC*, 828 F. Supp. 741, 744 (N.D. Ca. 1993) (finding that the fact that a case raises serious First Amendment questions compels a finding that there exists "the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [Plaintiffs'] favor."). When the injury is a "serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing of meritoriousness." *Sammartano*, 303 F.3d at 974. Without an injunction against the speech codes, the College Republicans will be forced to continue self-censorship or risk prosecution. This is a substantial threat of irreparable injury.

16

An injunction will not harm Defendants. They are free to enforce California's lawful and constitutionally appropriate criminal statutes with the assistance of local police. "Everyday school discipline does not depend on the necessity of a speech code." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002). In addition, Defendants may "enact new regulations that are tailored so as to conform to First Amendment jurisprudence." *Shippensburg*, 280 F. Supp. 2d at 373. Enjoining Defendants will not alter their ability to maintain a safe place for public education. Plaintiffs, by contrast, are suffering irreparable injury.

## III.    INJUNCTION WILL SERVE THE PUBLIC INTEREST.

An injunction will serve the public interest: "In the absence of legitimate countervailing concerns, the public interest clearly favors the protection of constitutional rights. . . " *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 884 (3d Cir. 1997); *see also Sammartano,* 303 F.3d at 974 (citing circuits that hold the same). An injunction will restore the marketplace of ideas on campus and protect the critical values of free speech and open intellectual inquiry. The "freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). With injunctive relief, College Republicans, Wolf, Downes, and all CSU and SFSU students will be able to speak freely, without fear of Defendants' reprisal.

## CONCLUSION

Defendants' speech code defies not merely controlling precedent but also the very purpose of the modern public university. Plaintiffs seek to enjoin Defendants' enforcement of Cal. Code Regs. tit. 5, § 41301(a) and (b)(7), and the "Student Group Misconduct" section of San Francisco State University's Student Organization Handbook. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian*, 385 U.S. at 603. Plaintiffs respectfully request that this Court protect the First Amendment rights of CSU and SFSU students by enjoining Defendants' unconstitutional speech code.

//

17

Respectfully submitted this 31st day of August, 2007,

/s/David J. Hacker

DAVID J. HACKER
California Bar No. 249272
Illinois Bar No. 6283022
Alliance Defense Fund
101 Parkshore Drive, Suite 100
Folsom, California 95630
(916) 932-2850
(916) 932-2851—facsimile
dhacker@telladf.org

DAVID A. FRENCH*
Tennessee Bar No. 16692
Kentucky Bar No. 86986
Alliance Defense Fund
12 Public Square
Columbia, Tennessee 38401
(931) 490-0591
(931) 490-7989—facsimile
dfrench@telladf.org

BENJAMIN W. BULL
Arizona Bar No. 009940
TRAVIS C. BARHAM*
Arizona Bar No. 024867
Alliance Defense Fund
15333 N. Pima Road, Suite 165
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028—facsimile
bbull@telladf.org
tbarham@telladf.org

Attorneys for Plaintiffs

*Pro hac vice admission

18