1  CALIFORNIA STATE UNIVERSITY
   OFFICE OF GENERAL COUNSEL
2  CHRISTINE HELWICK (SBN 057274)
   ANDREA M. GUNN (SBN 212259)
3  401 Golden Shore, Fourth Floor
   Long Beach, CA  90802-4210
4  Telephone: (562) 951-4500
   Facsimile:  (562) 951-4956 or 4959
5  agunn@calstate.edu
6
   Attorneys for Defendants CHARLES B. REED, ROBERT A. CORRIGAN, J.E. SAFFOLD,
7  and JOEY GREENWELL
8
                    UNITED STATES DISTRICT COURT
9
          NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION
10

11  COLLEGE REPUBLICANS AT SAN           CASE NO.: C 07 3542 WDB
    FRANCISCO STATE UNIVERSITY, et al.,
12
                 Plaintiffs,             Date:     October 31, 2007
13                                       Time:     1:30 p.m.
                 v.                      Dep't:    4
14                                       Judge:    Honorable Wayne D. Brazil
15  CHARLES B. REED, et al.,
16               Defendants.
17                                       **DEFENDANTS' OPPOSITION TO
                                         PLAINTIFFS' MOTION FOR
18                                       PRELIMINARY INJUNCTION;
                                         MEMORANDUM OF POINTS AND
19                                       AUTHORITIES**
20                                       [Filed concurrently with Declaration of Joey
                                         Greenwell and Proposed Order]
21
22                                       Action Filed:  July 9, 2007
                                         Trial Date:    None Set
23
24
25
26
27
28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................i – ii

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION..................................1

I.    INTRODUCTION...................................................................................1

II.   STATEMENT OF FACTS...................................................................1

    A.    The Parties...................................................................................1

    B.    The Disputed Policies...................................................................2

    C.    The October 17, 2006, Event...........................................................3

    D.    The SFSU Complaint Resolution Process..............................................5

    E.    Application of the SFSU Complaint Resolution Process to
           the Complaint Filed Against the College Republicans........................8

III.  ARGUMENT.......................................................................................10

    A.    Standard of Review......................................................................10

    B.    Plaintiffs Are Not Reasonably Likely to Prevail on the Merits of Their Claims.........11

         1.    Section 41301 (a) Does Not Implicate First Amendment Concerns...............11

         2.    The Disputed Policies are Content and Viewpoint-Neutral
             Regulations of Conduct, Not Speech.....................................12

         3.    The Disputed Policies Are Not Overboard.....................................13

         4.    The Disputed Policies Are Not Vague.........................................14

         5.    Defendants Did Not Apply the Disputed Policies to Chill College
             Republicans' Expression on Campus.......................................15

    C.    Plaintiffs Have Not Shown A Significant Threat Of Irreparable Harm...................15

    D.    Plaintiffs Have Not Shown That Legal Remedies Are Inadequate.......................16

    E.    Injunction Will Harm The Defendants And Will Not Serve the Public Interest.........16

IV.   CONCLUSION.......................................................................................17

# TABLE OF AUTHORITIES

## CASES

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers,*
415 U.S. 423 (1974)..................................................................................................10

*IT Corp v. County of Imperial,*
35 Cal. 3d 63 (1983).................................................................................................10

*Kikumura v. Hurley,*
242 F. 3d 950 (10th Cir. 2001)..................................................................................10

*Tahoe Keys Prop. Owners Ass'n v. State Water Resources Control Board,*
23 Cal. App. 4th 1459 (1994)....................................................................................11

*Korean Philadelphia Presbyterian Church v. California Presbytery,*
77 Cal App. 4th 1069 (2000).....................................................................................11

*Bair v. Shippensburg University,*
280 F. Supp. 2d 357 (M.D. Pa. 2003)........................................................................11

*Trustees of the California State University v. Local 1`352, San Francisco,*
  *State College Federation of Teachers,*
13 Cal. App. 3d 863 (1970).......................................................................................11

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989)..................................................................................................12

*City of Erie v. Pap's A.M.,*
529 U.S. 277(2000)...................................................................................................12

*Clark v. Community for Creative Non-Violence,*
468 U.S. 288 (1984)..................................................................................................12

*United States v. Lee,*
455 U.S. 252 (1982)..................................................................................................12

*American Family Ass'n, Inc. v. City and County of San Francisco,*
277 F 3d 1114 (9th Cir. 2002)...................................................................................12

*Widmar v. Vincent,*
454 U.S. 263 (1981)..................................................................................................13

*Healey v. James,*
408 U.S. 169 (1972)..................................................................................................13

*Tinker v. Des Moines Indep. Cmty. School District,*
393 U.S. 503 (1969)..................................................................................................13

i

*Grayned v. City of Rockford,*
408 U.S. 104 (1972)..................................................................................................13, 14

*Saxe v. State College Area District,*
240 F. 3d 200 (3d Cir. 2001)......................................................................................13, 14

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973).........................................................................................................13

*UWN Post, Inc. v. Board of Regents of University of Wisconsin System,*
774 F. Supp. 1163 (E.D. Wis. 1991)..........................................................................13, 14

*New York v. Ferber,*
458 U.S. 747 (1982).........................................................................................................13

*Houston v. Hill,*
482 U.S. 451 (1987).........................................................................................................13

*Bethel School District v. Fraser,*
478 U.S. 675 (1986).........................................................................................................14

*Texas v. Johnson,*
491 U.S. 397 (1989).........................................................................................................15

*Sammartano v. First Judicial District,*
303 F. 3d 959...................................................................................................................16

*Weaver v. Florida Power & Light Co.,*
172 F. 3d 771 (11th Cir. 1999).......................................................................................16

## STATUTES AND REGULATIONS

California Education Code §§ 66600, 89000, 89001..............................................................1
California Code of Regulations, Title 5 § 41301............................................................2, 12
California Constitution Article 20, 23.................................................................................11

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION – C-07-3542 (WDB)**

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION

## I.    INTRODUCTION

The California State University system has a proud tradition of encouraging public debate on its campuses. Nowhere is this more evident than on the San Francisco State University campus. On any given week, SFSU students, staff, and faculty engage in public debate in all forms – including protests, demonstrations, and rallies like the one at issue in this proceeding. However, such public debate cannot come at the expense of the rights of the students, staff, and faculty to pursue their educational and career objectives and of the University to pursue its educational mission. To protect these rights while still encouraging free speech and expression, SFSU has in place reasonable restrictions on student and student organization conduct. The aim of these policies and procedures is not to prohibit protected First Amendment expressive activities. Moreover, upon examination, they do not bear any resemblance in either substance or intent to the policies at issue in the myriad "speech code" cases Plaintiffs cite in ostensible support of their claims. Plaintiffs have cherry-picked certain words from SFSU's policies in a tortured attempt to find a basis for their claims. When taken in their proper context, the disputed policies restrict conduct, not protected speech or expressive activities, and are not facially or as-applied overbroad or vague. For these reasons, Plaintiffs' motion for preliminary injunction must be denied.

## II.    STATEMENT OF FACTS

### A.    THE PARTIES.

This is an action brought by the College Republicans at SFSU – an unincorporated student organization – and two individual SFSU students who are also officers of the SFSU College Republicans organization.

CSU is the State of California acting in its higher education capacity and is a public entity. The CSU Board of Trustees is vested by statute with the authority to manage, administer and control CSU's institutions of higher learning, including SFSU. (Cal. Educ. Code §§ 66600, 89000, 89001). Defendant Reed is the Chancellor of the CSU system and a member of the Board of Trustees. Defendant Corrigan is the President of SFSU. Defendant Saffold serves as the SFSU Vice President

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION – C-07-3542 (WDB)**

of Student Affairs, and Defendant Greenwell serves as the Director of the Office of Student Programs & Leadership Development ("OSPLD").

**B.**     **THE DISPUTED POLICIES.**

As stated in the Introduction above, SFSU maintains reasonable restrictions on student and student organization conduct.   Individual student conduct is governed in part by the SFSU Standards for Student Conduct ("Student Conduct Code"),[1] which are based upon the CSU systemwide policy contained within Article 2 (Student Conduct), Subchapter 4 (Student Affairs), Chapter 1 (California State University), Division 5 (Board of Trustees of the California State Universities) of Title 5 of the California Code of Regulations.  (Cal. Code Regs., tit. 5, § 41301).  Plaintiffs challenge the following provisions in the SFSU Student Conduct Code:[2]

> 1)     Standards for Student Conduct, Title 5, § 41301:
> > a.     Student Responsibilities: Students are expected to be good citizens and to engage in responsible behaviors that reflect well upon their university, <u>to be civil to one another</u> and to others in the campus community, and to contribute positively to student and university life. (Emphasis added).
>
> 2)     Standards for Student Conduct, Title 5, § 41301:
> > b.     Unacceptable Student Behaviors:  The following behavior is subject to disciplinary sanctions:
> > > 7.     Conduct that threatens or endangers the health or safety of any person within or related to the university community, including physical abuse, threats, <u>intimidation</u>, <u>harassment</u>, or sexual misconduct.[3] (Emphasis added).

Plaintiffs appear to claim that § 41301(a) is somehow defective because the word "civil" is not defined.  Similarly, Plaintiffs claim that § 41301(b)(7) does not pass constitutional muster because the words "intimidation" and "harassment" are not defined.

Student organizations are governed in part by the OSPLD Student Organization Handbook ("Handbook").  OSPLD is responsible for advising the approximately 220 student organizations on the

---

[1]  Plaintiffs leave out the word "conduct" in their short-hand for this particular policy in a rather transparent attempt to frame this as a speech restrictive rather than conduct-based policy.

[2]  For the Court's convenience, the complete text of § 41301 is included in Exhibit B to the Greenwell Declaration.

[3]  It should be noted that Plaintiffs disingenuously fail to cite the full text of this policy anywhere in their moving papers.

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION – C-07-3542 (WDB)**

SFSU campus.  (Greenwell Decl. at ¶ 2).  OSPLD registers, recognizes, and provides leadership development and event planning resources to student organizations. (*Id.*).  OSPLD also approves and oversees all outdoor/indoor events planned by student organizations and works with University partners with all events on campus.    (*Id.*).  When necessary, it is responsible for administering sanctions to student organizations as determined through the Student Organization Hearing Panel ("SOHP") process. (*Id.*).

The Handbook states that student organization members are expected to comply with the Student Conduct Code and all University policies and procedures for student organizations, and that the organization may be held accountable for any failure on the members' parts to do so. (*See* Pltfs' Compl., Exhibit A at 8 ("Student Group Misconduct").  In the "Student Group Misconduct" section, Plaintiffs take issue with the following:

> **Collective Responsibility**
> It is expected that each organization will establish and enforce policies to achieve responsible group governance.  While members may be held accountable for their actions individually, corrective actions may also be imposed upon an entire organization for individual members' actions when the behavior is inconsistent with SF State <u>goals</u>, <u>principles</u> and policies.

(*Id.*; Emphasis added).  Plaintiffs appear to claim that this section is defective for its alleged failure to define the words "goals" and "principles."

## C.    THE OCTOBER 17, 2006, EVENT.

On October 17, 2006, Plaintiff College Republicans sponsored an event in Malcolm X Plaza on the SFSU campus.  (Greenwell Decl. at ¶ 24).  The event was entitled an "Anti-Terrorism Rally" with the following event description submitted to OSPLD:

> "We will discuss terrorism around the world and its affect [*sic*] on different countries.
> We want to remember all those who have died from terrorism by setting up a memorial for some of the latest victims and countries of terrorism.  We will display flags of different countries that have been attacked by terrorism.  We will also discuss the organizations in the world that are considered terrorist and how they should be dealt with."

(*Id.*).

The event took place from 12-2 p.m., and consisted of visual displays, student speakers, and music.  (Greenwell Decl. at ¶ 25).  Members of OSPLD staff and University Police were on-hand at

the event to help ensure the health and safety of all present.[4] (Greenwell Decl. at ¶ 26). As part of the event, two pieces of butcher paper depicting the flag of Hamas, a Palestinian organization, and Hezbollah, a Lebanese organization, were displayed. (Greenwell Decl. at ¶ 28). Both flags had the word "Allah" written on them in clear Arabic script. (*Id.*). At one point during the event, members of College Republicans placed the flags on the ground and began stepping on them, declaring Hamas and Hezbollah to be terrorist organizations. (*Id.*). It should be noted that the event occurred during the month of Ramadan (September 14 – October 21 in 2006), considered one of the most holy months for the Islamic community. (Greenwell Decl. at ¶ 29).

A large group of students had gathered in Malcolm X Plaza to watch the event. (Greenwell Decl. at ¶ 30). When some students in the crowd (including members from the Muslim community) recognized what the College Republican members were stepping on, they voiced concerns to these members that the flags included the word "Allah." (*Id.*). After some heated discussion, the College Republicans allowed some students to make changes to the flags in an attempt to remove the word "Allah." (*Id.*). However, the markers did not completely block out the word. (*Id.*).

Thereafter, one student went up to the stage to address his concerns. (Greenwell Decl. at ¶ 31). He asked for the flags to be removed and the College Republicans refused. (*Id.*). After asking again several times, the concerned student began to get angry and started to climb onto the stage to prevent the College Republicans from stepping on the flags. (*Id.*). Seeing how upset the student was getting, the College Republicans asked what they could do to keep the situation peaceful. (Greenwell Decl. at ¶ 32). They then agreed to let him take the Hamas flag from the stage, folding it up and handing it to the student. (*Id.*). The Hezbollah flag remained. (*Id.*).

---

[4] OSPLD's presence, as well as that of University Police, is seen at all outdoor events where there may be opposing viewpoints to the scheduled activities. They are simply there to help ensure safety. They do not address or restrict the topics of the scheduled activities, nor the speech or expressive conduct related to such topics. In fact, the College Republicans have received OSPLD's support in ensuring a safe event on a number of occasions. Examples include two recent "anti-illegal immigration bake sales." These were tabling events where College Republican members wore border patrol uniforms and had a fence around their table with a hole where people could get their cupcakes. These events upset many members of the University community (including students, faculty and staff). At the time, Defendant Greenwell was asked by numerous people to stop these activities, but did not act on these requests. (Greenwell Decl. at ¶ 27).

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION – C-07-3542 (WDB)**

1    Following this interaction, which Defendant Greenwell and University Police monitored

2    carefully, the student left the stage. (Greenwell Decl. at ¶ 33).    Throughout the rest of the event,

3    members of the audience continued to debate with the College Republicans regarding their activities

4    and also the significance of the word "Allah" in many cultures.    (*Id.*).    At no time was the event

5    impeded. (Greenwell Decl. at ¶ 26).

6    On October 26, 2006, OSPLD received a timely written complaint regarding the event from

7    SFSU student Brian Gallagher.  (Greenwell Decl. at ¶ 34).  That complaint alleged violations of the

8    Student Conduct Code.  (*Id.*).  More specifically, the complaint alleged that the College Republicans

9    had, by their actions, attempted to incite violence and create a hostile environment.  (*Id.*).  The

10    complaint also alleged that the College Republicans had engaged in so-called "actions of incivility."

11    (*Id.*).

12    **D.    THE SFSU COMPLAINT RESOLUTION PROCESS.**

13    All allegations of misconduct against a recognized student organization, such as the

14    organization College Republicans at issue here, when not resolved with an informal resolution, shall

15    be subject to formal review by the SOHP.  (Greenwell Decl. at ¶ 5; Exhibit A – OSPLD Student

16    Group Misconduct, Procedures for Filing Complaints of Alleged Violation of University Policies &

17    Complaint Disposition ("Complaint Procedures"), Section E.).  SOHP is comprised of SFSU students,

18    faculty, and staff for the purpose of hearing student organization violations and for determining

19    appropriate sanctions. (Greenwell Decl. at ¶ 6; Exhibit A, Complaint Procedures at Section F.).

20    The SOHP process is meant to be primarily educational in nature, not punitive.    (Greenwell

21    Decl. at ¶ 7).  Its intent is to allow for peer – as opposed to SFSU administration - review of non-

22    academic complaints.  (*Id.*).  Its express purpose is as follows:

23    "SF State is a learning community in which student organizations play a valuable role.
As part of this role, student organizations must fully recognize their responsibilities as
24    well as their rights and privileges. SOHP and its procedures were developed to ensure
that matters of student organization conduct are handled consistently and fairly, and that
25    they are resolved in accordance with the educational purpose of the university and due
process standards …."
26

27    (Greenwell Decl. at ¶ 7; *see* Exhibit A, Complaint Procedures at Statement of Principles.)

28

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION – C-07-3542 (WDB)**

The SOHP process was first instituted due to questions regarding how alleged violations of University policies were being handled following an incident between a Jewish student organization and Palestinian student organization in May 2002. (Greenwell Decl. at ¶ 8). Prior to that time, the Director of OSPLD made the determinations of violation and also imposed sanctions. (*Id.*). The Palestinian student organization was held accountable in the May 2002 incident, and the determination was disputed. (*Id.*). Following this incident, a retreat of student leaders was held. (Greenwell Decl. at ¶ 9). One of the recommendations from this retreat was to revise how alleged student conduct violations were handled and to create a conduct review process. (*Id.*). A committee was then formed of students, staff and administrators to review the recommendations and to come up with a fair and consistent process as means to provide student organizations due process. (*Id.*). This was also designed to take the Director of OSPLD out of the decision-making process and to instead allow for peer review and resolution of complaints. (*Id.*). The committee met for several months and from its work came the SOHP process. (*Id.*).

The SOHP process began being used on the SFSU campus in 2003. (Greenwell Decl. at ¶ 10). This process is in place to give all student organizations due process regarding allegations of violations of University policy. (*Id.*). It is not meant to be overly time-consuming or burdensome on any of the parties involved. (*Id.*).

SOHP consists of 5 voting members: 2 students (appointed by the Associated Students Incorporated), 1 staff member (appointed by the Associate Vice President for Academic Affairs), and 2 faculty members (appointed by the Academic Senate). (Greenwell Decl. at ¶ 11; Exhibit A, Complaint Procedures at Section F.1.). SOHP members serve a one-year term and the OSPLD Director convenes and trains the panel. (*Id.*).

A complaint alleging non-academic misconduct by a student organization may be filed by anyone, but must be in writing, signed, dated and submitted to the Director of the OSPLD. (Greenwell Decl. at ¶ 12; Exhibit A, Complaint Procedures at Section B.1.) The complaint must be submitted within 7 working days of the alleged violation and must include any supporting evidence, documentation, and names of witnesses. (*Id.*).

1    Upon receipt of a complaint, OSPLD initiates an investigation by forwarding written Notice of

2    Charges to the student organization at issue. (Greenwell Decl. at ¶ 13; Exhibit A, Complaint

3    Procedures at Section C.1.). The Director of the OSPLD also notifies SOHP at this initial stage that

4    charges have been brought against a student organization. (*Id.*; Exhibit A, Complaint Procedures at

5    Section C.5.). It is in the OSPLD Director's discretion to determine whether the matter proceeds first

6    to informal resolution or immediately to the formal SOHP disciplinary process. (Greenwell Decl. at ¶

7    14; Exhibit A, Complaint Procedures at Section D.).

8    The SOHP hearing itself is not a formal adjudicatory hearing. (Greenwell Decl. at ¶ 15). The

9    accused student organization may have representation present during any stage of the proceedings, but

10    the role of the representative may be limited during the hearing by SOHP. (*Id.*; Exhibit A, Complaint

11    Procedures at Section J.). Attorneys are expressly prohibited to act as the student organization(s)'

12    representative in this process. (Greenwell Decl. at ¶ 16; Exhibit A, Complaint Procedures at Section

13    J.). SOHP hearings are closed to the public. (*Id.*; Exhibit A, Complaint Procedures at Section L.).

14    SOHP's directive is to determine whether the facts demonstrate a violation of the SFSU policy

15    or policies with which the student organization has been charged. (Greenwell Decl. at ¶ 17; *see*

16    Exhibit A, Complaint Procedures at Section N.1.). In making this determination, SOHP hears

17    witnesses and reviews evidence submitted by both the complainant and the accused student

18    organization. (*Id.*; *see* Exhibit A, Complaint Procedures at Section M.). The accused student

19    organization may request access to and/or copies of all of the documentary evidence that will be

20    presented in support of the charges at the hearing. (Greenwell Decl. at ¶ 18; Exhibit A, Complaint

21    Procedures at Section I.1.). Any such evidence will be made available for inspection as soon as

22    practicable, but no later than 5 working days before the hearing. (*Id.*) No later than 4 working days

23    prior to the hearing, the accused student organization must provide SOHP with its evidence and

24    documentation refuting the charges. (Greenwell Decl. at ¶ 19; Exhibit A, Complaint Procedures at

25    Section I.2.). It must also provide a list of witnesses that the student organization requests be called at

26    the hearing. (*Id.*).

27    After the hearing, SOHP makes findings of fact and conclusions about whether the SFSU

28    policies have been violated. (Greenwell Decl. at ¶ 20). SOHP's determination is made on the basis of

7

whether it was more likely than not that the student organization charged violated SFSU policy. (*Id.*; Exhibit A, Complaint Procedures at Section N.1.). After making its determination, SOHP submits a written report to the Director of the OSPLD, which includes a determination as to whether the student organization violated SFSU policy and, if so, the sanctions imposed. (Greenwell Decl. at ¶ 21; Exhibit A, Complaint Procedures at Section N.2.). Sanctions may include, but are not limited to, a letter of warning, censure, probation, suspension, or revocation of the organization's recognition on the SFSU campus. (*Id.*; Exhibit A, Complaint Procedures at Section P.) SOHP may consult with the Director of the OSPLD regarding its determinations, but the Director does not advocate for or dictate any particular outcome. (*Id.*).

SOHP's report is to be submitted to the Director of the OSPLD within 10 working days of the conclusion of the hearing. (Greenwell Decl. at ¶ 22; Exhibit A, Complaint Procedures at Section N.2.). The decision of the SOHP is final. (Greenwell Decl. at ¶ 23; Exhibit A, Complaint Procedures at Section N.3.).

## E.  APPLICATION OF THE SFSU COMPLAINT RESOLUTION PROCESS TO THE COMPLAINT FILED AGAINST THE COLLEGE REPUBLICANS.

Once OSPLD received Gallagher's complaint, Defendant Greenwell consulted with then SFSU Associate Vice President for Student Affairs, Kevin Bowman, regarding the best way to proceed. (Greenwell Decl. at ¶ 35). After a thoughtful discussion, they decided that the complaint should go through the formal - as opposed to informal - process due to the following: 1) although the allegation of "actions of incivility" did not implicate a University policy, but instead a principle and aspiration of the University, the accusations that the College Republicans had "incited violence" did meet a level of serious concern warranting a fuller examination of the facts; and 2) considering the history of how SOHP came into existence, it was decided that a peer review process would be the best option to help ensure due process for all parties involved. (*Id.*). It was understood that during such a process, the College Republicans would be able to continue to function like any other student organization with all of the same privileges. (*Id.*).

On October 30, 2006, Defendant Greenwell notified Carl Clark, then President of the College Republicans, via e-mail that a letter of complaint regarding the October 17 event had been received.

(Greenwell Decl. at ¶ 36, Exhibit B – E-mail from Joey Greenwell to Carl Clark). He notified him that a meeting had been set-up for November 2, 2006, to discuss the charges and the complaint resolution process. (*See id.*) The e-mail included excerpts of Gallagher's allegations, as well as links to the entire Student Code of Conduct and the Complaint Procedures. (*See id.*)

Between October 30, 2006, and the beginning of December 2006, members of the OSPLD staff, including Defendant Greenwell, conducted 14 witness interviews. (Greenwell Decl. at ¶ 37). They made a point to try to interview everyone both the College Republicans and Gallagher wanted them to. (*Id.*) Among those interviewed were College Republican members Carl Clark (President), Mike DeGroff (Vice President), and Leigh Wolf (Public Information Officer).[5] (*Id.*). They also interviewed numerous individuals who had separately complained about the event. (*Id.*). These complainants echoed Gallagher's allegation that the College Republicans had acted to incite violence. (*Id.*). Additional interviewees included student members of the Muslim Student Association and the General Union of Palestine Students, representatives from Associated Students Inc., as well as students with no student organization affiliation. (*Id.*).

On December 5, 2006, Defendant Greenwell e-mailed both Carl Clark and Brian Gallagher to inform them that OSPLD had concluded its investigation into the October 17 event. (Greenwell Decl. at ¶ 38; Exhibit C – E-mails from Joey Greenwell to Carl Clark and Brian Gallagher). In that e-mail, Defendant Greenwell also notified the parties that OSPLD's comprehensive investigative report had been forwarded to SOHP for review and that the SOHP Chair should be contacted directly if they had any specific questions related to that review. (*Id.*). SOHP did not itself conduct any further fact-finding related to the complaint after OSPLD provided its report on December 5, 2006. (Greenwell Decl. at ¶ 39).

Between December 5, 2006, and the hearing date of March 9, 2007, SOHP experienced numerous difficulties in trying to set the hearing date, which served to unavoidably delay the process. (Greenwell Decl. at ¶ 41). First, with the investigative report being finished in early December, and with the Finals Period and Winter Break following shortly thereafter, it was difficult to convene the

---

[5]/  Plaintiff Trent Downes was not offered as a potential witness and was never interviewed about the event. (Greenwell Decl. at ¶ 37).

9

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION – C-07-3542 (WDB)**

1    SOHP prior to everyone leaving campus. (*Id.*). Students did not return back to campus until January

2    24, 2007. (*Id.*). Second, in late January, the Associated Students Inc. Board of Directors decided to

3    remove one of their representatives from SOHP when it was discovered that the representative had

4    voted in favor of the AS resolution against College Republicans related to the October 17 event. (*Id.*).

5    The basis for this removal was to avoid any conflict of interest. (*Id.*). It took some time to find a new

6    AS representative and get this person trained, and this, too, resulted in delays in scheduling the

7    hearing. (*Id.*). Lastly, SOHP simply found it difficult to coordinate a mutually available date and time

8    to convene the hearing in the face of five busy schedules. (*Id.*). The panel was finally able to agree on

9    March 9, 2007 for the hearing date. (*Id.*).

10      The hearing went forward as scheduled on March 9, 2007. (Greenwell Decl. at ¶ 42). After

11    the hearing, SOHP met to determine whether the facts, as shown through the documentary evidence

12    and hearing testimony, demonstrated that the College Republicans had violated University policy.

13    The panel found that they had not and dismissed Gallagher's complaint. (Greenwell Decl. at ¶ 43).

14    **III.**    **ARGUMENT**

15       **A.**     **STANDARD OF REVIEW**

16      The purpose of injunctive relief is to *preserve* the status quo pending a fuller hearing on the

17    merits. (*Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers*, 415 U.S.

18    423, 439 (1974)). In determining whether or not to issue a preliminary injunction, a trial court must

19    evaluate two interrelated factors. The first is the likelihood that the plaintiff will prevail on the merits

20    at trial. (*IT Corp v. County of Imperial,* 35 Cal.3d 63, 69-70 (1983)). The second is the interim harm

21    the plaintiff may suffer if the injunction is denied as compared to the harm that the defendant may

22    suffer if the injunction is granted. (*Id.*). However, when the purpose of the injunctive relief sought is

23    to *alter* the status quo, as it is here, plaintiff is subject to a higher standard and must show that the

24    requirements for injunctive relief weigh "heavily and compellingly" in his or her favor. (*Kikumura v.*

25    *Hurley*, 242 F.3d 950, 955 (10th Cir. 2001))

26

27

28

CSU is a state agency—it is the State of California acting in its higher education capacity.[6] Public policy considerations come into play when a preliminary injunction is sought against a public agency or officer.  A "significant" showing of irreparable injury is required because there is a "general rule against enjoining officers or agencies from performing their duties" as is the case here.  (*Tahoe Keys Prop. Owners Ass'n. v. State Water Resources Control Bd.*, 23 Cal. App. 4th 1459, 1471 (1994)). Moreover, the threat of "irreparable harm" must be imminent…as opposed to a mere possibility of harm sometime in the future.  "An injunction cannot issue in a vacuum based on the proponent's fears about something that may or may not happen in the future.  It must be supported by actual evidence that there is a realistic prospect that the party enjoined intends to engage in the prohibited activity." (*Korean Philadelphia Presbyterian Church v. California Presbytery*, 77 Cal. App. 4th 1069, 1084 (2000)).  Applying the above principles, Plaintiffs' Motion must be denied.

**B.    PLAINTIFFS ARE NOT REASONABLY LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.**

**1.    Section 41301(a) Does Not Implicate First Amendment Concerns.**

As stated above, this section reads: "Student Responsibilities: Students are expected to be good citizens and to engage in responsible behaviors that reflect well upon their university, to be civil to one another and to others in the campus community, and to contribute positively to student and university life."  On its face, this section merely expresses University philosophy, principles and goals.  It seeks to advise the student body of the University's ideals, and is therefore aspirational rather than restrictive.  In *Bair v. Shippensburg University*, 280 F.Supp.2d 357 (M.D. Pa. 2003), the court there held that a similarly aspirational sentence in the Preamble to Shippenburg's University Catalog did not implicate the First Amendment.  (280 F.Supp.2d at 370 [Preamble stated that "[t]he University will strive to protect [certain enumerated] freedoms if they are not inflammatory or harmful towards others."]  On this basis, Plaintiffs' request that § 41301(a) be enjoined must be denied.

---

[6] Cal. Const. Art. 20, §23, California Education Code Sections 89000, et seq.  (*Trustees of the California State University v. Local 1352, San Francisco State College Federation of Teachers*, 13 Cal. App. 3d 863, 865 (1970)).

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION – C-07-3542 (WDB)**

2.    **The Disputed Policies are Content and Viewpoint-Neutral Regulations of Conduct, Not Speech.**

Plaintiffs baldly assert that the disputed portions of the Student Conduct Code and Student Organization Handbook regulate student expression on the basis of "motivating ideology or the opinion or perspective of the speaker," which constitutes viewpoint discrimination – "an egregious form of content discrimination" – that is never allowed. (Pltfs' Mem. at 7:14-19). They provide no evidence to support this claim. They do not because they can not. Plaintiffs' free speech claims fail because the disputed policies when viewed in their proper context (and not as single words taken out of context) relate to conduct, not speech. They do not prevent Plaintiffs from exercising their First Amendment rights, but rather, are part of a reasonable and viewpoint-neutral regulatory scheme designed to prevent unlawful student conduct. SFSU's policies and procedures have never been used to restrict or otherwise chill First Amendment rights. (Greenwell Decl. at ¶ 4). Indeed, the Student Conduct Code, Title 5, Section 41301, at subsection c., states an express prohibition on such restriction. In relevant part, that subsection reads:

> "c.    Application of the Code
> … Nothing in the Code may conflict with the Education Code section 66301 that prohibits disciplinary action against students based on behavior protected by the First Amendment.

In particular, the Student Conduct Code falls squarely within the line of cases upholding content-neutral regulations "unrelated to the suppression of expression." (*See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) [noise ordinance does not violate Free Speech Clause even though it prohibited a loud rock band from espousing its anti-racist views]; *City of Erie v. Pap's A.M.*, 529 U.S. 277, 291-301 (2000) [upholding public indecency ordinance that was "on its face a content neutral restriction that regulates conduct, not First Amendment expression"]; *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984); cf. *United States v. Lee*, 455 U.S. 252 (1982) [rejecting challenge to neutral, generally applicable Social Security taxes]). Thus, because "Defendants have not imposed or even threatened any prohibitions or sanctions for the Plaintiff's viewpoint," Plaintiffs cannot prevail on this claim. (*Am. Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)).

Plaintiffs' reliance on cases such as *Widmar v. Vincent*, 454 U.S. 263 (1981), is unpersuasive. *Widmar* involved an attempt by a university to discriminate against groups "based on the religious content of [the] group's intended speech." (*Widmar*, 454 U.S. at 269-70 [emphasis added]).   In fact, the court in *Widmar* went out of its way to affirm the speech/conduct distinction that controls here: "we affirm the continuing validity of cases, *e.g. Healy v. James*, 408 U.S. 169, 188-89 (1972), that recognize a University's right to exclude even First Amendment activities that violate reasonable campus rules ...." (454 U.S. at 278).   Further, to the extent Plaintiffs claim that the policies at issue impermissibly regulate expressive conduct, it has long been accepted that universities have greater authority to regulate such conduct within their confines given the unique nature of the educational forum. (*See, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969) [holding that expressive activity in a school setting can only be restricted if it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others"); *Grayned v. City of Rockford*, 408 U.S. 104, 117-18 (1972) [stating that the Court had never "suggested that students, teachers, or anyone else has an absolute right to use all parts of a school building or its immediate environs for his [or her] unlimited expressive purposes"]).

### 3.    The Disputed Policies Are Not Overbroad.

To render a law – or in this case, a policy – unconstitutional on its face, the overbreadth must be "not only real but substantial in relation to the [policy's] plainly legitimate sweep." (*Saxe v. State College Area Dist.*, 240 F.3d 200, 214 (3d Cir. 2001), citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).   The Supreme Court has held that "the overbreadth doctrine is 'strong medicine'" and that it should be employed "with hesitation, and then 'only as a last resort." (*UWN Post, Inc. v. Board of Regents of University of Wisconsin System*, 774 F.Supp. 1163, 1168 (E.D. Wis. 1991), citing *new York v. Ferber*, 458 U.S. 747, 769 (1982) and *Broadrick*, 413 U.S. at 601).   A policy should not be held "invalid on it face merely because it is possible to conceive of a single impermissible application ...." (*Houston v. Hill*, 482 U.S. 451, 458 (1987), quoting *Broadrick*, 413 U.S. at 630 (Brennan, J. dissenting)).   Additionally, a policy may be struck down only if no reasonable limiting instruction is available that would render the policy constitutional.   (*See Saxe*, 240 F.3d at 215).   Upon close examination of the full text of the disputed policies – and without, as Plaintiffs so egregiously do,

1   taking words out of context – application of the overbreadth doctrine as to any of the policies at issue

2   is unwarranted.

3       Plaintiffs appear rest their overbreadth claims on an unsupported contention that the disputed

4   policies "ban expression based on listener's reactions." (Pltfs' Mem. at 9:14-15).  Plaintiffs really have

5   to stretch to make this argument.  On their face, it is hard to see how "expression" is banned by the

6   policies, much less that such bans are based on "listener's reactions."   In particular, the words

7   "intimidation" and "harassment" used in § 41301, describe specific types of prohibited conduct;

8   conduct that threatens or endangers the health and safety of persons in or related to the University

9   community. These words are clearly not the same the arguably imprecise and subjective adjectives

10  ("intimidating" and "harassing") the courts in cases like *Saxe* and *UWN Post, Inc.* disapproved.

11      Defendants also note that Plaintiffs' contention that "any SFSU community member has the

12  power to define [the prohibitions at issue] on a case by case basis, leading to multiple interpretations

13  and unequal enforcement" is misleading.  (Pltfs' Mem. at 11:12-13).  While it is true that anyone in

14  the "SFSU community" may file a complaint regarding violations of University policy, the policies are

15  not "defined" by the complainant but instead analyzed and applied through SFSU's complaint

16  resolution procedures (the "SOHP process" when informal resolution is not possible).  As described in

17  detail above, due process mechanisms are in place at all times to help protect students and student

18  organizations from possibility of "unbridled discretion in enforcement."

19              **4.    The Disputed Policies Are Not Vague.**

20      Plaintiffs claim that the disputed policies are void for vagueness on the ground that they do not

21  provide fair notice of prohibited conduct. As a preliminary matter, it is inappropriate to expect the

22  same level of precision in drafting school disciplinary policies as is expected of legislative bodies

23  drafting criminal restrictions.  (*See Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 686 (1986)).  Thus, even

24  if the words Plaintiffs have chosen to focus on were imprecise, which Defendants do not concede,

25  Defendants should be given some amount of leeway in the drafting of their policies.  As the court in

26  *Grayned, supra,* so aptly stated: "Condemned to the use of words, we can never expect mathematical

27  certainty from our language." (408 U.S. at 110).

28

More importantly, the words at issue do, in fact, have common-sense meanings that are informed by the context of the "policies" within which they occur. It is difficult to see how anyone would be truly unclear as to what conduct was prohibited.

### 5.    Defendants Did Not Apply the Disputed Policies to Chill College Republicans' Expression on Campus.

The complaint lodged against College Republicans did not only allege "actions of incivility," it also alleged that the organization had acted to "incite violence." Such claims cannot be dismissed as merely "ideological disagreement and hurt feelings." (Pltfs' Mem. at 13:10). OSPLD took these claims very seriously and in the interest of providing as fair and full an examination of the facts as possible, it conducted a comprehensive investigation over an approximately one-month period, not five months as Plaintiffs contend. OSPLD then referred the matter to SOHP for formal review and resolution. Plaintiffs read *Texas v. Johnson*, 491 U.S. 397 (1989) to find that their actions on October 17 were protected expression and ultimately SOHP agreed with them, but given the facts which even Plaintiffs admit showed that some students threatened to attack members of the College Republicans for their actions (Compl. at ¶ 43), the most prudent course was the one taken by SFSU. That course – application of the SFSU complaint resolution procedures - provided the full panoply of due process protections to everyone involved. Plaintiffs were ultimately vindicated and have continued to exercise their First Amendment rights without prohibition on the campus.

### C.    PLAINTIFFS HAVE NOT SHOWN A SIGNIFICANT THREAT OF IRREPARABLE HARM.

Plaintiffs have not established a sufficient degree of irreparable harm to warrant preliminary injunction, in light of their negligible probability of success. To support their claim of irreparable harm, Plaintiffs make the unsupported claims that "[w]ithout an injunction against the speech codes, the College Republicans will be forced to continue self-censorship or risk prosecution" and that "[t]his is a substantial threat of irreparable injury." (Plaintiffs' Mem. at 16:27-28). Plaintiffs' unsupported assertions, alone, do not establish the need for preliminary injunction.

Plaintiffs' lack of evidence to support their request for emergency relief to alter the status quo is understandable, when one considers their own admissions that they have not been chilled in the exercise of their First Amendment rights since the October 17 event and subsequent SOHP review.

15

Moreover, Plaintiffs' reliance on *Sammartano v. First Judicial Dist.*, 303 F.3d 959, 973-974 (9th Cir. 2002), is unconvincing because the import relates to the required showing of meritoriousness when there is a serious infringement on core expressive freedoms. The policies at issue here simply do not infringe on such freedoms. Here, the only "infringement" imposed by CSU is the refusal to abide conduct that threatens or endangers the health and safety of others. The policies do not require Plaintiffs to abandon or alter any particular viewpoint, and Plaintiffs remain free to engage in their chosen expressive activities.

When balancing the unlikelihood of success with the dearth of evidence of irreparable harm, Plaintiffs' request for preliminary injunction must be denied.

### D.    PLAINTIFFS HAVE NOT SHOWN THAT LEGAL REMEDIES ARE INADEQUATE.

Plaintiffs' Motion fails to demonstrate that Plaintiffs have no adequate legal remedy to justify their request for injunction. Plaintiffs' lawsuit is the adequate framework for addressing their alleged constitutional violations. The lawsuit seeks the preliminary injunction at issue here, a permanent injunction, compensatory and punitive damages, attorneys' fees and costs, and declaratory relief as to the constitutionality of Defendants' student conduct policies and complaint resolution process. (*See* Compl. at 20:19 – 21:8). The instant lawsuit serves as an adequate legal remedy to those concerns. Injunctive relief must be denied when plaintiffs have an adequate legal alternative to the same relief. (*Weaver v. Florida Power & Light Co.*, 172 F.3d 771, 773 (11th Cir. 1999)).

### E.    INJUNCTION WILL HARM THE DEFENDANTS AND WILL NOT SERVE THE PUBLIC INTEREST.

It should be plain that enjoining Defendants from enforcing Student Conduct Code § 41301(b)(7), which prohibits conduct that threatens or endangers the health or safety of any person within or related to the university community would not serve the public interest. Contrary to what Plaintiffs so cavalierly state, such enjoinment would harm Defendants by significantly altering their ability to maintain a safe place for public education. Plaintiffs' demand in this regard can only lead to a nonsensical, if not potentially dangerous result. As for enjoinment of the other disputed policies,

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION – C-07-3542 (WDB)**

given that they do not implicate First Amendment rights or otherwise chill them in any way, there can be no benefit to the public in taking such action.

**IV.    <u>CONCLUSION</u>**

For each of the reasons specified above, Plaintiffs' motion for preliminary injunction must be denied.

CALIFORNIA STATE UNIVERSITY
OFFICE OF GENERAL COUNSEL

DATED:  October 10, 2007

Andrea M. Gunn
Attorney for Defendants
CHARLES B. REED, ROBERT A. CORRIGAN,
J.E. SAFFOLD, and JOEY GREENWELL

**PROOF OF SERVICE**
**College Republicans at SFSU, et al. v. Roberta Achtenberg, et al.**
**USDC Northern District Case No.:  C 07-3542 (WDB)**
**OGC File No. 07-0909**

I, **Deanna L. Thompson**, declare as follows:

I am employed in the County of Los Angeles, State of California.  I am at least 18 years old, and not a party to this action.  I am an employee of or agent for California State University, Office of General Counsel, whose business address is 401 Golden Shore, 4th Floor, Long Beach, CA  90802-4210.

On **October 10, 2007**, I served the document described as **DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JOEY GREENWELL IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; [PROPOSED] ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** on the interested parties in this action as follows:

**PLEASE SEE ATTACHED SERVICE LIST**

☐    **BY MAIL—COLLECTION BOX:**  I placed each document in a sealed envelope with postage fully prepaid, in the California State University Office of General Counsel's mail collection box in Long Beach, California, so that following ordinary business practices, the envelope would be collected and mailed on this date.  I am readily familiar with this office's business practice for collection and processing of mail.  In the ordinary course of business, each document would be deposited with the United States Postal Service on that same day.

☐    **BY MAIL—PERSONAL DEPOSIT:**  I placed each document in a sealed envelope with postage fully prepaid and then deposited the envelope in a mail box regularly maintained by the United States Postal Service in Long Beach, California.

☑    **BY ELECTRONIC SERVICE:**  I delivered each document via electronic service to the attached service list.

☐    **BY OVERNIGHT DELIVERY:**  I placed each document in a sealed envelope with delivery fees fully prepaid, to be deposited in a box regularly maintained by Federal Express.  I am readily familiar with this office's practice for collection and processing of documents for overnight delivery and know that in the ordinary course of California State University Office of General Counsel's business practice the envelope will be deposited in a box or other facility regularly maintained by Federal Express or delivered to a courier authorized by Federal Express to receive documents on the same date it is placed at California State University Office of General Counsel for collection.

☐    **BY FACSIMILE:**  By use of facsimile machine number (562) 951-4956 [4959], on **2007**, at Long Beach, California, I served each document on the parties by transmitting each document to each facsimile numbers above, which are the facsimile machine telephone numbers last given by those parties.  Each transmission was reported as complete and without error.  The transmission report was properly issued by the transmitting facsimile machine.  A copy is attached, and shows the actual time of transmission.

Signed on **October 10, 2007**, at Long Beach, California.  I declare under penalty of perjury under the laws of the State of California that this declaration is true and correct.

**DEANNA L. THOMPSON**

**PROOF OF SERVICE**

1

**PROOF OF SERVICE**
**College Republicans at SFSU, et al. v. Roberta Achtenberg, et al.**

2

**USDC Northern District Case No.:  C 07-3542 (WDB)**
**OGC File No. 07-0909**

3

4

**SERVICE LIST**

5

6    Benjamin W. Bull
     Travis C. Barham
7    ALLIANCE DEFENSE FUND
     15333 N. Pima Road, Suite 165
8    Scottsdale, Arizona  85260
     480-444-0020
9    480-444-0028  Facsimile
     bbull@telladf.org
10   tbarham@telladf.org

11   David A. French
     ALLIANCE DEFENSE FUND
12   7141 Old Zion Road
     Columbia, Tennessee  38401
13   931-490-0591
     931-490-7989  Facsimile
14   dfrench@telladf.org

15   David J. Hacker
     ALLIANCE DEFENSE FUND
16   101 Parkshore Drive, Suite 100
     Folsom, California  95630
17   916-932-2850
     916-932-2851  Facsimile
18   dhacker@telladf.org

19

20

21

22

23

24

25

26

27

28