**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COLLEGE REPUBLICANS AT SAN FRANCISCO STATE UNIVERSITY., et al.,

              Plaintiffs

    v.

CHARLES B. REED, et al.

              Defendants.

_____/

No. C 07-3542WDB

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

    The central issues that we address in the pages that follow are these:  does a public university violate the First Amendment[1] if its regulations purport to empower it to punish students (1) on the undifferentiated ground that their behavior was "inconsistent with [the university's] goals, principles, and policies," or (2) for engaging in conduct that is not "civil."  We also consider whether the First Amendment permits a university to proscribe "intimidation" or "harassment" that appears to threaten or endanger another person's safety.

    Plaintiffs are an organization, College Republicans at San Francisco State University ("SFSU"), and two of the organization's members.  Defendants are

---

[1]  The First Amendment is applicable to the individual States through the Fourteenth Amendment.

administrators with either the California State University System ("CSU") or with SFSU.   Plaintiffs have filed a motion asking the court to issue a preliminary injunction that would prohibit the defendants from enforcing two provisions of the Student Conduct Code and one provision in the SFSU Student Organization Handbook.   In support of their request, plaintiffs contend that each of the provisions they challenge is unconstitutionally overbroad and vague.[2]

For the reasons set forth below, the Court GRANTS in part and DENIES in part plaintiffs' Motion for Preliminary Injunction.

I       BACKGROUND

A.       Factual and Procedural History

This action arose from an investigation launched by SFSU following an on-campus "Anti-Terrorism Rally" on Tuesday, October 17, 2006.  The rally was sponsored by plaintiff College Republicans at San Francisco State University. College Republicans is a student organization founded at SFSU in 2003; it is a local chapter of a national organization known as the College Republicans National Committee.  Plaintiffs Leigh Wolf and Trent Downes are officers of the local organization.

Plaintiffs assert that the purpose of their Anti-Terrorism Rally was to educate members of the campus about domestic and international terrorism, to memorialize those who have been victims of recent terrorist attacks, to identify prominent terrorist organizations around the world, and to trigger a dialogue about

---

[2]   Plaintiffs challenge two sections of CSU's Standards for Student Conduct Code, Cal. Code Regs. tit. 5, §§ 41301(a) & (b)(7)(2007) (the "Code"), and a provision on "Collective Responsibility" in the section on Student Group Misconduct in SFSU's Student Organization Handbook (the "Collective Responsibility provision").

The challenges that plaintiffs press in the motion on which we rule in these pages are facial and are based on two theoretically independent First Amendment norms: overbreadth and vagueness.  We have concluded that our disposition of the claims based on the theory of overbreadth make it unnecessary, at this stage in the proceedings, to address the overlapping claims based on the theory of vagueness.

The plaintiffs' challenge to these provisions "as applied" is not ripe for disposition through this motion.

how properly to respond to these groups.  The rally took place at mid-day at the Malcolm X Plaza on the SFSU campus and consisted of visual displays, speeches by students, and music.  For one of the visual displays, members of the College Republicans exhibited two pieces of butcher paper, one depicting the flag of Hamas, a Palestinian Organization, and the other depicting the flag of Hezbollah, a Lebanese organization.  Both of the flags included words in Arabic script, one of which was "Allah."  Plaintiffs assert that when they began their rally they did not know that the script on either replicated flag included  the word "Allah."

At one point during the rally, members of the College Republicans placed the paper depictions of the Hamas and Hezbollah flags on the ground and began stepping on them.  A few students in the large group that had gathered to watch the event voiced strong objections to the College Republicans stepping on flags that included the word "Allah."  In response, the College Republicans allowed several students to use marking pens to try to cover or block out the word about which feelings were so strong.  These attempts were not completely successful.  Ultimately, the College Republicans permitted one of the offended students from the audience  to take the Hamas flag off the stage.  The Hezbollah flag remained.

As the rally progressed, SFSU students and members of the College Republicans continued a heated debate about the significance of the word "Allah" on the flags and the propriety of the way the College Republicans had chosen to communicate their political views.  University Police were present in Malcolm X Square during the rally to ensure student safety, but it never became necessary for them to intervene.   The rally came to a peaceful close  — but the emotions it had ignited continued to fester.

On October 26, 2006, one week after the rally, an SFSU student, Brian Gallagher, submitted to Defendant Joey Greenwell, the Director of the Office of Student Programs & Leadership Development ("OSPLD"), a formal letter of

complaint against the College Republicans for their actions during the rally.

Among other things, Mr. Gallagher decried the fact that members of the

organization "very evidently walked over and trekked over a banner with Arabic

script . . . [that] represented the word 'Allah,' otherwise known as the name of God

in Arabic." *See* October 26, 2006, letter from B. Gallagher to J. Greenwell. Mr.

Gallagher also asserted that the College Republicans:

> [D]ebased and violated the following principles in [sic] which this
> university proclaims to be its standards. Why has a group of
> college students chosen to pursue such actions of *incivility*?
> I am at a loss for words and continue in my state of bewilderment
> as to why this route of intolerance and stupidity was chosen.
> Such actions do nothing but foment *incivility* and discourage
> critical analysis.

*Id*. (emphasis added).   The letter went on to say that Mr. Gallagher "hope[d] this

matter [would] be promptly dealt with in a judicious manner where justice will be

served and wrongs made right."  *Id.*  At the end of his letter of complaint, Mr.

Gallagher quoted Section 41301(a) of the Code on "Standards for Student

Conduct" — one of the provisions at issue in this lawsuit — which states, in part,

that "students are expected to be . . . *civil* to one another and to others in the

campus community  . . . ."  *Id.* (citing Cal. Code Regs. tit. 5, § 41301(a))

(emphasis added).[3]

      Under rules that had been adopted earlier by SFSU, a letter of complaint like

Mr. Gallagher's triggers a set of procedures that are set forth in the Student

Organization Handbook that is promulgated by SFSU's Office of Student Programs

and Leadership Development.  *See* Exhibit A to the First Amended Verified

Complaint, filed August 30, 2007.  Under these procedures, the Director of OSPLD

(currently Mr. Greenwell) is to respond initially to a complaint against a student

organization by communicating the substance of the complaint to the organization

---

      [3]  The full text of this provision and the other provisions at issue in the Motion are set forth
below in Section I.B.

4

and conducting an informal inquiry.  With the information he gathers through this initial inquiry, the Director determines whether the matter is to be resolved either (1) through an informal process that fosters communication between the persons who have complained and the organization against whom the complaint was made or (2) by referring the complaint to the Student Organization Hearing Panel (SOHP) for a formal investigation and hearing.  That Panel is empowered to impose discipline on a student organization if it concludes that the behavior of some of its members[4] is "inconsistent with SF State goals, principles and policies." *See* Section on Student Group Misconduct in SFSU Student Organization Handbook, Section on Collective Responsibility.  The disciplinary measures that the Panel is empowered to impose include "warning, censure, probation, suspension, or revocation of the organization's recognition." *Id.*

After receiving Mr.  Gallagher's letter, Director Greenwell sent a formal notification to the College Republicans that advised them about the complaint. He stated that:

> [T]he complaint describes alleged actions of walking on a banner with the word 'Allah' written in Arabic script.  The complaint also includes:
>
> 1.) Allegations of attempts to incite violence and create a hostile environment
> 2.) Allegations of actions of incivility.
>
> At this time, the University policy being posed as allegedly violated includes:
>
> **Standards for Student Conduct , California Code of Regulations Title V, § 41301**
>
> The University is committed to maintaining a safe and healthy living and learning environment for students, faculty, and staff.  Each member of the campus community must choose behaviors that contribute toward this end.  Student behavior that is not consistent with the Student Conduct Code is addressed through an educational process that is designed to promote safety

---

[4]  An organization is subject to discipline if two or more of its officers or three or more of its non-officer members engage in behaviors that are "inconsistent" with University "goals, principles and policies." *See* Section on Student Group Misconduct in SFSU Student Organization Handbook, Section on Collective Responsibility.

5

> and good citizenship and, when necessary, impose appropriate consequences.
>
> (a)  Student Responsibilities
>
> Students are expected to be good citizens and to engage in responsible behaviors that reflect well upon their university, to be civil to one another and to others in the campus community, and contribute positively to student and university life.

*See* Email from J. Greenwell, dated October 30, 2006.  Director Greenwell closed this formal notification by reminding the College Republicans where they could access the full Code of Conduct and informing them that a "meeting has been scheduled to meet with you and discuss the charges and process for . . . November 2, 2006." *Id.*

What happened during that meeting (or even whether it took place) is not clear, but a few days later Mr. Gallagher submitted[5] copies of emails from several other students who complained in a similar spirit about the way the College Republicans allegedly had disparaged the Muslim religion during their rally. According to Mr.  Gallagher, these emails evidenced the "public outcry over actions taken by the College Republicans" at the rally on October 17th.  *See* November 2006, emails from B. Gallagher to ASI Officers.  One of these emails complained that "[n]o religion should ever be talked down upon or as in this case stomped on." *Id.* (Complaint Letter #5).  Another student noted that the behavior of the College Republicans at the rally was "intolerable and goes against the morals and ethics here at S.F.S. U." *Id.* (Complaint Letter #6).   A third student declared that the behavior was "downright insulting and offensive."  *Id.* (Complaint Letter #7).

By early December of 2006 Director Greenwell had completed his investigation and had concluded (for reasons not divulged) that the matters pressed in Mr.  Gallagher's complaint should not be resolved informally but should be

---

[5]   It appears that Mr.  Gallagher submitted the emails to the Associated Students, Inc.  We assume that copies also reached Director Greenwell, but that has not been made clear in the record.

referred to the Student Organization Hearing Panel for formal disciplinary proceedings (an investigation and hearing). That Panel, composed of two students, two members of the faculty, and one member of the campus staff, received Director Greenwell's formal referral on December 5, 2006. It is not clear what further investigation (if any) that Panel initiated, but the formal hearing was not held until early March of 2007. After taking testimony from numerous witnesses, and considering other evidentiary submissions, the Panel concluded that Mr. Gallagher had not proved that College Republicans had violated University policy. The Panel therefore dismissed Mr. Gallagher's complaint without imposing sanctions on the accused student organization.

On July 9, 2007, the College Republicans, and two of its officers, Mr. Wolf and Mr. Downes, filed this Section 1983 action, claiming, among other things, that the CSU and SFSU policies under which they were charged and investigated are facially overbroad and vague in violation of the First Amendment. That contention is the basis for the Motion for a Preliminary Injunction that we address here.

### B.    The Challenged Provisions of the Code and of the Handbook

Plaintiffs challenge the following provisions in the Student Conduct Code, which sets forth regulations that are promulgated by the CSU Board of Trustees and that apply state-wide to all campuses in the CSU system.

**Standards for Student Conduct, Cal. Code Regs. Title 5, § 41301**

The University is committed to maintaining a safe and healthy living and learning environment for students, faculty, and staff. Each member of the campus community must choose behaviors that contribute toward this end. Student behavior that is not consistent with the Student Conduct Code is addressed through an educational process that is designed to promote safety and good citizenship and, when necessary, impose appropriate consequences.

(a)    Student Responsibilities
Students are expected to be good citizens and to engage in responsible behaviors that reflect well upon their university, to be *civil* to one another and to others in the campus

7

1    community, and to contribute positively to student and
2    university life.

3    (b)    Unacceptable Student Behaviors

4        (7)  Conduct that threatens or endangers the health or
5        safety of any person within or related to the University
        community, including physical abuse, threats, *intimidation*,
6        *harassment*, or sexual misconduct.

Cal. Code Regs. tit. 5, §§ 41301(a) & (b)(7) (emphasis added).

Plaintiffs also challenge the following "Collective Responsibility Provision"

in the Student Organization Handbook, which applies only to SFSU students:

Student Organization Handbook — Section on Student Group Misconduct

**Collective Responsibility Provision**

It is expected that each organization will establish and
enforce policies to achieve responsible group governance.
While members may be held accountable for their actions
individually, corrective actions may also be imposed upon
an entire organization for individual members' actions
when the behavior is inconsistent with SF State *goals,*
*principles, and policies*.

Section on Student Group Misconduct in SFSU Student Organization Handbook

(emphasis added).

Plaintiffs contend that several terms or phrases in the provisions just quoted

are Constitutionally overbroad and vague — and, therefore, cannot serve as

grounds for initiating disciplinary proceedings in response to expressive conduct.

Plaintiffs single out the word "civil" in § 41301(a), which sets forth "Student

Responsibilities," the terms "intimidation" and "harassment" in § 41301(b)(7),

which describes one set of "Unacceptable Student Behaviors," and the phrase

"inconsistent with SF State goals, principles and policies" in the provisions of the

Handbook that apply to "Student Group Misconduct."   It is plaintiffs' position that

these words and phrases are so imprecise and sweep so broadly that, if left in place,

they would empower the University to punish students and their organizations for

8

engaging in a wide range of expressive activity that clearly is protected by the First Amendment.

Defendants, on the other hand, argue that these disputed policies apply only to conduct, not to protected speech, and are legitimate pieces of a "view-point neutral" regulatory scheme that is designed to prevent conduct that poses a danger to the health or safety of the campus community or that threatens serious disruption of the educational process.  Defendants also argue that the part of § 41301(a) that calls on students to be "civil to one another" is merely a declaration of aspiration, merely hortatory, not a command whose violation could support imposition of discipline.

The dilemma is that it is conceivable that the goals and policies of a university, e.g., to promote respectful and reasoned discourse on issues of moment, might be in direct conflict with rights protected by the First Amendment, which can entitle people, in some settings, to express themselves in unreasoned, disrespectful and intensely emotional ways.  Thus,  a student might simultaneously behave in a manner that is patently inconsistent with SFSU's goals and policies but that is protected under the First Amendment.  It is with this dilemma that we wrestle in the pages that follow.

II    PRELIMINARY INJUNCTION

The Ninth Circuit has established two sets of criteria for evaluating a request for a preliminary injunction. *Earth Island Inst. v. United States Forest Serv*., 351 F.3d 1291, 1297 (9th Cir. 2003).  "Under the 'traditional' criteria, a plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the [preliminary] injunction if the plaintiff demonstrates either a combination of probable success on the merits and

9

1   the possibility of irreparable injury or that serious questions are raised and the

2   balance of hardships tips sharply in his favor." *The Freecycle Network, Inc. v.*

3   *Oey*, ___ F.3d ___, 2007 WL 2781902, at *2 (9th Cir. Sept. 26, 2007).

4   In a case like the one at bar, where the First Amendment is implicated, "[t]he

5   Supreme Court has made clear that '[t]he loss of First Amendment freedoms, for

6   even minimal periods of time, unquestionably constitutes irreparable injury' for

7   purposes of the issuance of a preliminary injunction." *Sammartano v. First Jud.*

8   *Dist. Ct.*, 303 F.3d 959, 973-74 (9th Cir. 2002) (quoting and citing *Elrod v. Burns*,

9   427 U.S. 347, 373 (1976)).  In other words, the requirement that a party who is

10  seeking a preliminary injunction show "irreparable injury" is deemed fully satisfied

11  if the party shows that, without the injunction, First Amendment freedoms would

12  be lost, even for a short period.

13  In cases like this the "balancing of the hardships" also tends to turn on

14  whether the challengers can show that the regulations they attack are substantially

15  overbroad.   A party who proves that a regulation is substantially overbroad

16  necessarily (as we shall explain) has shown that leaving the regulation on the

17  books would substantially chill the exercise of fragile and constitutionally

18  fundamental rights.  In sharp contrast, defendants who are temporarily enjoined

19  from enforcing a regulation because it is overbroad often are in a position to adopt,

20  at least on an interim basis, a more narrowly crafted set of provisions that enable

21  the defendants to achieve their legitimate ends without unjustifiably invading First

22  Amendment freedoms.  Similarly, the requirement that issuance of a preliminary

23  injunction be in the "public interest"  usually is deemed satisfied when it is clear

24  that core constitutional rights would remain in jeopardy unless the court

25  intervened.

26  Given this precedential backdrop, whether we grant plaintiffs' motion to

27  issue a preliminary injunction in this case turns, for all practical purposes, on

28  whether plaintiffs can persuade us, with respect to any or all of the provisions they

10

1    challenge, that there is a strong likelihood that they will prevail on the merits of

2    their overbreadth claims.

3

4                      *Likelihood of Success on the Merits*

5            Before exploring the play between the doctrine of "overbreadth" and the

6    specific regulations that the plaintiffs challenge in this case we should

7    acknowledge squarely that the protections afforded by the First Amendment are

8    not absolute or limitless.  For example, there are certain well-defined and narrowly

9    limited classes of speech or expressive conduct that the courts have long permitted

10   the government to regulate or proscribe — despite the First Amendment.  "These

11   include the lewd and obscene, the profane, the libelous, and . . . 'fighting words.'"

12   *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942).  Speech or expressive

13   conduct that is directed to "inciting or producing imminent lawless action and

14   [that] is likely to incite or produce such action," also is subject to regulation.

15   *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (*per curiam*).  In addition, the

16   Constitution permits government to proscribe "true threats."  *See Virginia v. Black*,

17   538 U.S. 343, 360 (2003) (citing, *Watts v. United States*, 394 U.S. 705, 708

18   (1969)). "'True threats' encompass those statements where the speaker means to

19   communicate a serious expression of an intent to commit an act of unlawful

20   violence to a particular individual or group of individuals." *Id.*  Thus, a law that

21   regulated or proscribed only one of these categories of speech or expressive

22   activity would not run afoul of the First Amendment.   At least some of the

23   prohibitions of the Student Code of Conduct and the Student Organization

24   Handbook that plaintiffs challenge here, however, reach well beyond any of these

25   narrow categories.  That fact opens the door for plaintiffs overbreadth challenge.

26       Overbreadth

27       It "has long been recognized that the First Amendment needs breathing

28   space and that statutes attempting to restrict or burden the exercise of First

                                        11

Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973).  Thus, under the overbreadth doctrine, a pronouncement  by the government that prohibits, burdens, or restricts appreciably more protected expressive activity than is necessary to achieve a competing and compelling public interest cannot survive constitutional attack.

On the other hand, courts understand that declaring a provision of law unenforceable can seriously interfere with the government's pursuit of legitimate ends and can be construed as disrespectful of the legislative or executive branch. Accordingly, "particularly where conduct and not merely speech is involved," we may conclude that a provision of law is unconstitutionally overbroad only when the overbreadth is both real and "substantial . . . judged in relation to the statute's plainly legitimate sweep." *Id.* at 615.  For the same reasons, courts will not use the overbreadth doctrine to completely remove a law from the legal landscape if they can identify a construction of the law that would narrow its reach so that it would pass constitutional muster. *Id*. at 614.

Thus, in addressing a challenge based on the overbreadth doctrine, we proceed in several steps.  First, we determine whether the law or regulation in issue is subject to a reasonable interpretation that would narrow its reach.  It is important to emphasize, however, that for purposes of overbreadth analysis, we cannot give a challenged rule or regulation a narrowing construction that is accessible only through a strained construction of its terms or thrust.  This follows because our ultimate concern is about how a rule or regulation would be understood by reasonable people of common sense who might believe their activities could be subject to it.  So, a court cannot try to save a challenged  regulation by giving it a construction that would be anticipated by only a small percentage of the people whose activities that regulation might cover.

After having identified the narrowest reasonable construction of the regulation, we determine whether, so construed, the regulation would prohibit, deter, or burden speech or expressive conduct that is protected by the First Amendment (i.e., speech or expressive activity that it would be unlawful for the government to suppress). If the regulation could be applied to some Constitutionally protected speech or activity, our next task is to determine whether the extent of the regulation's reach into the zone of activity that the Constitution protects from regulation of this kind is "substantial . . . judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615.

One way to conceptualize this task is to envision two spheres, one inside the other. Both spheres contain activity that reasonable people would understand is subject to control by the regulation that is being examined to determine if it is overbroad. The outer, larger sphere contains (captures) **all** of the activity that falls within the reasonably construed reach of the regulation. In contrast, the inner, smaller sphere, contains only some of the activity that falls within the reach of the regulation; what sets the inner sphere apart is that it contains only activity that it is perfectly lawful for the government to restrict or burden through the kind of regulation that is being challenged. So all the speech or conduct that falls within the inner sphere is speech or conduct that the Constitution permits the government to regulate. The speech or expressive conduct that falls within the outer, larger sphere, but that is not within the inner sphere, is the speech or conduct that is covered by the challenged regulation but that the First Amendment prohibits the government from restricting or burdening.

After determining the size of each of these two spheres, we compare them. If the inner sphere takes up most of the space within the outer sphere, the regulation is not overbroad. But if the outer sphere is substantially larger than the inner sphere, the law is overbroad in violation of the First Amendment and must be stricken.

While the need to accommodate important competing interests makes it difficult to draw bright line distinctions in much First Amendment jurisprudence, there are some clearly established propositions to which we must attend while we are determining the size of the two spheres of activity that the regulations in issue in this case seem to reach.  One such proposition is that the state cannot proscribe speech or conduct that is merely "offensive to good taste."  *Papish v. the Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670-71 (1973); *see also Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (striking down university speech code:  "Nor could the university proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people.").  "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *Street v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that . . . the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.").

In striking a college anti-harassment  policy as unconstitutionally overbroad, in *Saxe v. State College Area Sch. Dist.,* 240 F.3d 200, 215 (3rd Cir. 2001), the Third Circuit expressed this rule clearly:  "[n]o one would suggest that a school could constitutionally ban any unwelcome verbal . . . conduct which offends . . . an individual because of some enumerated personal characteristics.  Nor could the school constitutionally restrict, without more, any unwelcome verbal . . . conduct directed at the characteristics of a person's religion."  Stated another way, speech or expressive conduct cannot be banned because of "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969).

There is one additional set of principles that we must acknowledge before we begin our application of doctrine to the provisions that plaintiffs challenge.

14

First Amendment jurisprudence is quite context-sensitive.  How much protection the Amendment offers, and what analytical route the courts must follow to make that determination, can vary dramatically with the specific characteristics of the environment or setting in which the challenges are made.   The same type of regulation might survive First Amendment challenge in one context but fail to survive it in another.  This follows in part because the nature of the governmental interests that the challenged regulations are designed to promote can vary considerably from setting to setting — as can the magnitude or sensitivity of competing First Amendment concerns.

These generalizations are well-illustrated by competing doctrines that the parties commend to our attention in the case at bar.   While the words of the First Amendment remain static, the Supreme Court has shown us that these words can have very different meaning when applied to regulations imposed in primary and secondary  schools than when applied to regulations applied in colleges and universities.  For example, our high court consistently has recognized that in some circumstances secondary schools may regulate speech or expressive conduct that otherwise would be protected, and that "the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings." *Morse v. Frederick*, 127 S. Ct. 2618, 2622 (2007) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)).  More specifically, the Supreme Court has held that school officials may suppress high school students' expression where the officials reasonably conclude that the expression will "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513.  High schools also may prohibit speech that is lewd, vulgar, or profane, s*ee Fraser*, 478 U.S. 675, and may regulate speech that would reasonably be understood as "school-sponsored."  *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) (upholding a principal's deletion of student articles on teen pregnancy from a school-sponsored newspaper).

The courts have permitted these prohibitions and regulations in light of certain characteristics of grade school and high school settings.  In fixing the narrower scope of First Amendment protection in such schools, the courts have given weight to the mandatory nature of primary and secondary education, the fact that students in these environments typically are minors, and the "custodial and tutelary" responsibilities the schools must shoulder for the children.  *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995).[6]

While the issues in the case at bar also arise in an educational setting, for purposes of First Amendment analysis there are very important differences between primary and secondary schools, on the one hand, and colleges and universities, on the other.  As the courts often have acknowledged, the state does not require higher education and has much less interest in regulating it, the students in colleges and universities are not children, but emancipated (by law) adults, and, critically, the mission of institutions of higher learning is quite different from the mission of primary and secondary schools.   As courts have emphasized, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher learning]."  *Healy v. James*, 408 U.S. 169, 180 (1972) (internal citation and quotation omitted).  As our highest court has said, "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas. . . .'"  *Id.*   Supreme Court precedents "leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large."  *Id.* (internal quotations omitted).  Indeed, the core principles of the First Amendment "acquire a special significance in the university setting,

---

[6]   Even in these settings, however, the courts have imposed some limits on the extent to which school officials may circumscribe First Amendment freedoms. *See, e.g.*, *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524 (9th Cir. 1992), where the court of appeals permitted a First Amendment challenge to punishment that officials in a middle school sought to impose on students who wore "SCAB" buttons to protest the use of replacement teachers during a strike.  Because the school failed to present any evidence that the buttons were "inherently disruptive" to school activities, the Ninth Circuit held that students could proceed with their First Amendment claim. *Id.* at 531.

where the free and unfettered interplay of competing views is essential to the institution's educational mission."  *Doe v. Univ. of Mich.*, 721 F. Supp. at 863 (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

Lower federal courts consistently have been faithful to these principles when, on grounds of overbreadth, they have enjoined regulations in colleges or universities that purported to prohibit "acts of intolerance" (*see Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Penn. 2003))*, or* "stigmatizing or victimizing individuals or groups" in specified categories (*see Univ. of Mich.*, 721 F. Supp. at 863), or "insults, epithets, ridicule, or personal attacks."  *See Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004)).  While the courts that have invalidated provisions like these have expressed their sympathy, indeed their admiration, for the goals or purposes that the challenged universities were attempting to pursue, those same courts have seen clearly that the regulations in issue could not stand where their very existence would inhibit — in some substantial measure — the freedom of  expression that the Constitution guarantees.

Armed with the principles we have outlined in the preceding paragraphs, we turn now to the task of determining whether we must temporarily enjoin defendants from enforcing any or all of the regulations that plaintiffs contend are facially overbroad.

(a)    **Standards for Student Conduct,
Cal. Code Regs. Title 5, § 41301(a)**

We examine first the provision in subsection "a" of the "Standards for Student Conduct" which declares that one of the "Student Responsibilities" is "to be civil to one another and to others in the campus community."  Cal. Code Regs. tit. 5, § 41301(a).  Is this provision unconstitutionally overbroad?  For the reasons we set forth below, the answer is yes.

Defendants contend that this provision should not be subject to First Amendment challenge because it is only aspirational or hortatory and could not be

17

1  reasonably understood as providing a basis for disciplinary action.  For several

2  reasons, we find this argument unpersuasive.  First, we note that this provision

3  appears <u>within</u> a set of pronouncements that are entitled "Standards for Student

4  Conduct."  The provision that plaintiffs challenge is preceded immediately by a

5  broadly cast paragraph that clearly is intended to set forth general principles that

6  inform and are incorporated into to all of the passages that follow it.

7          This first, encompassing paragraph declares that "[e]ach student <u>must</u> choose

8  behaviors that contribute toward" the goal of "maintaining a safe and healthy living

9  and learning environment for students, faculty, and staff."   Cal. Code Regs. tit. 5,

10  § 41301 (emphasis added).  Immediately after announcing that students "must"

11  choose such behaviors, this initial paragraph declares that "[s]tudent behavior that

12  is not consistent with the Student Conduct Code is addressed through an

13  educational process that is designed to promote safety <u>and good citizenship</u> and,

14  when necessary, <u>impose appropriate consequences</u>."  *Id.* (emphasis added).  All of

15  these pronouncements precede, and clearly are intended to apply to, the subsequent

16  provision that informs students that one of their responsibilities is to be "civil."

17  Read reasonably, and in context, students would infer that their conduct  "must"

18  reflect "good citizenship" and be "civil" — and that if their conduct fails to

19  conform to these mandates, it may, "when necessary" result in the "imposition of

20  appropriate consequences."  For a group such as the College Republicans, such

21  consequences could include censure, suspension, or loss of recognition.

22          The Student Organization Handbook contains another basis for rejecting the

23  University's contention that the call for civility is merely aspirational and not

24  restrictive.  In the "Collective Responsibility" section of that Handbook the

25  University declares that "<u>corrective actions may also be imposed</u> upon an entire

26  organization for individual members' actions when the behavior is <u>inconsistent</u>

27  with SF State *goals, principles, and policies*."  *See* Section on Student Group

28  Misconduct in SFSU Student Organization Handbook, Collective Responsibility

Section (emphasis added).  Students reading these provisions could be expected to infer, quite reasonably, that "civil" behavior is a "goal, principle, [or] policy" of the University.

Ironically, however, we find the most powerful (or at least most dramatic) support for this conclusion in the conduct of the University itself.  The officer of the University who is presumed to have the greatest expertise in these matters, the Director of the Office of Student Programs and Leadership Development, clearly evidenced by his behavior in this matter that he understood the 'civility' provision to be a requirement whose alleged violation could trigger disciplinary proceedings and whose proven violation could support imposition of sanctions.  When he initiated the disciplinary process by formally giving notice to the College Republicans that he was beginning the investigation in response to Mr. Gallagher's complaint, Director Greenwell expressly cited "[a]llegations of actions of incivility" as one of the two predicates for initiating his inquiry.  *See* Email from J. Greenwell, dated October 30, 2006.  He then proceeded to identify only two paragraphs of the Standards for Student Conduct that were implicated by the complaint that he intended to investigate:  (1) the introductory paragraph [discussed above] of Title V, section 41301, which informs students that they "must choose behaviors" that maintain a safe and healthy living and learning environment and that reflect "good citizenship," and (2) the next paragraph, which declares that one of the "Student Responsibilities"  is "to be civil to one another . . . ."  *Id.* (citing Cal. Code Regs. tit. 5, § 41301(a)).

Director Greenwell again made it clear that he understood that the provision calling for civility could support disciplinary action when, some five weeks later, after he had concluded his inquiries and decided that the allegations in Mr. Gallagher's complaint should not be resolved informally, he referred  the matter to the Student Organization Hearing Panel for formal proceedings.  In the notice of this referral that he sent to the College Republicans he again cited "[a]llegations of

incivility" (under section 41301 of Title V)  as one of the two grounds for the proceedings before the Panel.  *See* Email from J. Greenwell, dated December 5, 2006.

For all the reasons set forth above, we find, for purposes of ruling on plaintiffs' motion for a preliminary injunction, that students would reasonably understand the civility provision that is in issue here to impose on them a duty whose violation could support imposition of sanctions.  We also find that (1) the University so understood this provision, and that (2) students would have a reasonable basis to fear that the University might in fact seek to discipline them if the University felt that their conduct was not "civil."

In the context of these findings, have plaintiffs persuaded us that there is a real likelihood that leaving the civility requirement intact would "chill" to a substantial degree expression, or expressive activity, that the First Amendment protects from governmental regulation?  The answer is yes.  As plaintiffs point out, the word "civil" is broad and elastic — and its reach is unpredictably variable in the eyes of different speakers.  Given the fact that this term is both opaque and malleable, the University's failure even to try to define it intensifies the risk that students will be deterred from engaging in controversial but fully protected activity out of fear of being disciplined for so doing.

It is important to emphasize here that it is <u>controversial</u> expression that it is the First Amendment's highest duty to protect.  By political definition, popular views need no protection.  It is <u>un</u>popular notions that are in the greatest peril — and it was primarily to protect their expression that the First Amendment was adopted.  The Framers of our Constitution believed that a democracy could remain healthy over time only if its citizens felt free both to invent new ideas and to vent thoughts and feelings that were thoroughly out of fashion.  Fashion, it was understood, is an agent of repression — and repression is an agent democracy's death.

1   This is a significant point because there is a much greater risk that
2   expressing new, unpopular or controversial ideas will trigger retaliatory action than
3   expressing popular ideas would.  Understanding that greater risk, it is the people
4   who want to express unpopular, controversial ideas who are more likely to be
5   deterred by the possibility of punishment.  It follows that the First  Amendment
6   must be less tolerant of restrictive intrusions into spheres of unpopular thought
7   than into spheres of popular thought.  So the likelihood that the First Amendment
8   will be offended increases with increases in the proportion of the expressive
9   activity that is captured only in the outer sphere that is controversial or unpopular.

10   Plaintiffs' challenge to the University's requirement that students "be civil to
11  one another" also brings another element of the freedom of expression equation
12  into play.  "Expression" takes many forms — and the capacity of any given
13  expression to attract attention or to convey its message can turn on its uniqueness
14  or the play between it and the environment or context in which it occurs.  These
15  facts of our socio-psychological life can mean that the  likelihood that any given
16  'expression' will reach and be understood by its intended audience can depend on
17  how obviously or how cleverly that expression varies from oft-used means or
18  commonly occurring forms of communication.[7]  Being civil, in contrast, suggests
19  conforming to widely accepted norms and forms.  Thus,  requiring students to be
20  civil might well require students to forsake the means of communication that are
21  most likely to be effective.

22   There also is an emotional dimension to the effectiveness of
23  communication.  Speakers, especially speakers on significant or controversial

24
25      [7]  "Anti-illegal immigration bake sales" that the College Republicans sponsored on two other
        occasions provide a perfect illustration of this concept.  *See* Declaration of Joey Greenwell in
        Opposition to Plaintiffs' Motion for Preliminary Injunction at p. 6.  At these events, the College
26      Republicans set up tables displaying the cakes that were for sale.  But these tables did not stand alone
        on the plaza.  Instead, the College Republicans erected fences around them — fences in which holes or
27      openings had been cut.  People who wanted to buy cakes had to climb or reach through the holes in the
        fence to acquire the food.  While this form or means of making a political point predictably would
28      offend many people and be considered disrespectful, its ability to attract attention and to deliver its
        message is based almost entirely on its creativity in bucking norms of political correctness.

issues, often want their audience to understand how passionately they feel about their subject or message.  For many speakers on religious or political subjects, for example, having their audience perceive and understand their passion, their intensity of feeling, can be the single most important aspect of an expressive act. And for many people, what matters most about a particular instance of communication is whether it inspires emotions in the audience, i.e., whether it has the emotional power to move the audience to action or to a different level of interest in or commitment to an idea or cause.  For such people, the effectiveness of communication is measured by its emotional impact, by the intensity of the resonance it creates.

How is all this relevant to our review of the University's civility requirement?  Civility connotes calmness, control, and deference or responsiveness to the circumstances, ideas, and feelings of others.[8]  Dictionaries use words like "courtesy" as a synonym for "civility;" they use phrases like "observing or befitting accepted social usages; polite" in defining the word "civil."  *See* Webster's II, New Riverside University Dictionary 266 (1984).  Given these common understandings, a regulation that mandates civility easily could be understood as permitting only those forms of interaction that produce as little friction as possible, forms that are thoroughly lubricated by restraint, moderation, respect, social convention, and reason.  The First Amendment difficulty with this kind of mandate should be obvious:  the requirement "to be civil to one another" and the directive to eschew behaviors that are not consistent with "good citizenship" reasonably can be understood as prohibiting the kind of communication that it is necessary to use to convey the full emotional power with which a speaker embraces her ideas or the intensity and richness of the feelings that attach her to her cause.  Similarly,

---

[8]   The Court admires these qualities — and nothing in this opinion is intended to suggest that it is untoward for a university to want to cultivate an environment that encourages open-minded, thorough, respectful and reasoned exploration of and debate about important and sensitive questions. The issue presented by plaintiffs' motion, however, is not what the Court admires, but what the First Amendment requires.

mandating civility could deprive speakers of the tools they most need to connect emotionally with their audience, to move their audience to share their passion.

In sum, there is a substantial risk that the civility requirement will inhibit or deter use of the forms and means of communication that, to many speakers in circumstances of the greatest First Amendment sensitivity, will be the most valued and the most effective.  To use our spheres metaphor,  the expressive conduct that is found only in the outer of the two spheres is quite substantial — not only in likely incidence, but also in centrality to First Amendment values and theory.

The events underlying the case at bar illustrate, tellingly, many of the points made in the preceding paragraphs.  The conduct in which the College Republicans engaged during their anti-terrorism rally was indisputably expressive.  And the subjects about which plaintiffs sought to express their views are as central to First Amendment sensibilities as any could be.  This was core political expression in a classic public forum — indeed, in one of the forums where First Amendment rights are to enjoy their greatest protection.  Clearly, the expressive conduct in issue here fired political passions and provoked intense debate.  It even inspired a hostile newspaper article.  The mode of communication that the plaintiffs chose was controversial.  To many in the audience, it seemed disrespectful and offensive.  But it is these very characteristics that were critical to its effectiveness.  A timid, tepid articulation of concern about terrorism likely would have been largely ignored — and certainly would not have provoked the discussion and debate that this rally precipitated.

The defendants have pointed to a paragraph at the end of  section 41301 that they contend should 'save' from Constitutional condemnation any of this regulation's proscriptions.  That paragraph, (d), contains two arguably relevant sentences.

One of these sentences addresses the subject of jurisdiction. It declares that "[c]onduct that threatens the safety or security of the campus community, or

23

substantially disrupts the functions or operation of the University is within the jurisdiction of this Article regardless of whether it occurs on or off campus."  Cal. Code Regs. tit. 5, § 41301(d).  The other sentence announces that "[n]othing in this Code may conflict with Education Code Section 66301 that prohibits disciplinary action against students based on behavior protected by the First Amendment."  *Id* (emphasis in original).

We are not persuaded that either of these sentences is likely to 'save' from First Amendment condemnation the mandate that students "be civil to one another."   First, these sentences appear at the end of a long regulation and in a paragraph this is separated from the regulation's substantive proscriptions.  There is no clue or signal in the initial paragraphs or in the substantive proscriptions of the regulation that there might be set forth at the end some clarification of or limitations on the regulation's mandates.  So it would not be obvious to a student who is consulting the substantive proscriptions (e.g., to determine whether some contemplated conduct is permitted) to turn to this last separate paragraph.

Moreover, even if a student were to examine this last paragraph, it is not clear what relevant conclusions he or she would draw from the text.  The sentence that speaks to the issue of jurisdiction does <u>not</u> declare that the Code can be used <u>only</u> to sanction conduct that threatens safety or security or that threatens to disrupt substantially the operation of the University.  College students are not lawyers. We cannot even assume that they know what the word "jurisdiction" means.  But if they do, we cannot assume that they will understand that a sentence that, on its face, merely identifies conduct that can be punished, is in fact implicitly announcing that it is <u>only</u> that kind of conduct that is covered by the Code.  A student might reasonably assume that if the true purpose of this sentence had been to communicate that important limiting concept, the drafters would have said so — as they obviously could have simply by inserting the word "only" at the beginning of the sentence.

24

An additional ambiguity infects the sentence that speaks of jurisdiction. In part because of its structure, and in part because of its omission of the word "only" (or some equivalent concept), there is at least some possibility that students who read this sentence would infer that its purpose was not to limit the kind of conduct that could be sanctioned, but, instead, to make sure that students understood that they could be punished for "off campus" violations of the substantive prohibitions of the Code.

In short, we cannot conclude, on this record, that this ambiguous sentence 'saves' the civility mandate. We are not persuaded that it is sufficiently likely that students would consult this sentence and understand that its effect is to modify, clarify, and limit all the substantive proscriptions that preceded it.

The sentence that announces that nothing in this Code "may conflict" with the Education Code's prohibition on punishing students for behavior that is protected by the First Amendment appears to have even less 'saving' power. This sentence communicates virtually nothing. How are college students to be able to determine (when judges have so much difficulty doing so) whether any particular speech or expressive conduct will be deemed (after the fact) to fall within the protections of the First Amendment? We must assess regulatory language in the real world context in which the persons being regulated will encounter that language. The persons being regulated here are college students, not scholars of First Amendment law. What does a college student see when he or she encounters section 41301? That student sees a long list of mandates and proscriptions, most of which seem to describe, in terms relatively familiar to the student and with a fair amount of particularity, various forms of "Unacceptable Student Behaviors." After seeing all these prohibitions, a student who is particularly thorough and patient also could read that nothing in the Code "may conflict" with a cited state statute that prohibits universities from violating students' First Amendment rights.

25

What path is a college student who faces this regulatory situation most likely to follow?  Is she more likely to feel that she should heed the relatively specific proscriptions of the Code that are set forth in words she thinks she understands, or is she more likely to feel that she can engage in conduct that violates those proscriptions (and thus is risky and likely controversial) in the hope that the powers-that-be will agree, after the fact, that the course of action she chose was protected by the First Amendment?  To us, this question is self-answering — and the answer condemns to valuelessness the allegedly 'saving' provision in the last paragraph of the Code that prohibits violations of the First Amendment.

For all the reasons discussed above, we conclude that there is a strong likelihood that plaintiffs will prevail on the merits of their overbreadth challenge to the provision in the Student Conduct Code that calls for students "to be civil to one another and to others in the campus community."

Because the plaintiffs have met their burden with respect to this provision, we PRELIMINARILY ENJOIN the defendants from attempting to apply or enforce the civility requirement.

///

///

///

///

///

///

///

///

///

///

///

///

26

1

(b)    **Standards for Student Conduct,**
**Cal. Code Regs. Title 5, § 41301(b)(7)**

2

3        The second provision in the Standards for Student Conduct that plaintiffs

4    contend is overbroad and in violation of the First Amendment prohibits "[c]onduct

5    that threatens or endangers the health or safety of any person within or related to

6    the University community, including physical abuse, threats, <u>intimidation</u>,

7    <u>harassment</u>, or sexual misconduct."  Cal. Code Regs. tit. 5, § 41301(b)(7),

8    governing "Unacceptable Student Behaviors"  (emphasis added).  Plaintiffs have

9    limited their challenge to two specific words within this provision: "intimidation"

     and "harassment."

10        Standing alone, the terms "intimidation" and "harassment" are not clearly

11   self-limiting and could be understood, reasonably, to proscribe at least some

12   expressive activity that would be protected by the First Amendment.  These

13   challenged words, however, do not stand alone.  They appear in a specific context.

14   Plaintiffs argue that that context cannot be understood, reasonably, as limiting or

15   qualifying the reach of these terms and, therefore, that the court must analyze each

16   of  them as if it appeared in isolation, as an independent, unqualified proscription.

17   Because this argument is vulnerable to apparently fatal counter-points, we cannot

18   base issuance of a preliminary injunction on it.

19        As we pointed out above, the Supreme Court has instructed us not to

20   invalidate a statute or regulation on grounds of overbreadth "when a limiting

21   construction has been or could be placed" on it that would remove what would

22   otherwise be its constitutional infirmities. *Broadrick*, 413 U.S. at 614.  In the case

23   at bar, the structure of the challenged provision itself suggests (arguably compels)

24   such a limiting construction.  The words "intimidation" and "harassment" appear in

25   this provision in a dependent clause whose terms appear to have been intended to

26   acquire operative effect only when the conditions set forth in the first and primary

27   clause are met.  Thus, in an interpretation that would readily suggest itself to a

28   reasonable reader, the provision as a whole can be understood along the following

27

lines.  First, in its lead  and central clause, it identifies the category of conduct that it proscribes:  "[c]onduct that threatens or endangers the health or safety of any person ."  Cal. Code Regs. tit. 5, § 41301(b)(7).  Then, in its secondary and dependent clause, it lists examples of kinds of conduct that it proscribes <u>when the specific form they take involves a threat to or endangerment of</u>  "the health or safety of any person within or related to the University community."  *Id.*  In other words, the structure of the challenged provision, viewed as a whole, suggests that it was not intended to proscribe "intimidation" or "harassment" in whatever form "intimidation" or "harassment" might take, but only the sub-category  of intimidation or harassment that "threatens or endangers the health or safety of any person."

There are additional considerations that support this interpretation of the challenged provision.  First, it likely was clear to the drafters of this provision that the words "intimidation" and "harassment" are not self-defining and could be understood to encompass a wide range of kinds of conduct.  The full reach of the concept of "harassment," for example, certainly is not clear.  The drafters of this provision likely knew, moreover, that what constitutes "harassment" can be very context specific:  one type of conduct could be completely innocuous (even constructive) in one setting but, in a different context, that same conduct could be considered "harassing."  Because such considerations might well have occurred to rational drafters of a provision like this, it is certainly not unlikely that they would have seen the importance of giving these elastic terms some limits, some meaningful content, when including them in what was clearly intended to be a proscriptive pronouncement.

Another consideration offers stronger support for the view that the challenged provision was intended to proscribe only a specified sub-category of intimidating or harassing conduct.  If the true intent of the authors of this provision had been to prohibit <u>all forms</u> of intimidation and harassment, it would have been

obvious how to do so.  They could have included in their long list of "unacceptable student behaviors" a simple, straightforward proscription of "intimidation or harassment" — unaccompanied by any complicating adjectives or limiting clauses. That the drafters chose not to follow this obvious course strongly suggests that they did not intend the provision they adopted to proscribe all forms of intimidation or harassment — but only those that threatened or endangered the health or safety of any person.

For all the reasons just discussed, plaintiffs have failed to persuade us that it is likely that they will be able to prove that this challenged provision of the Standards for Student Conduct was intended to proscribe all forms of "intimidation" or "harassment."   Instead, we think it more likely than not that, after a full trial on the merits, the finder of fact would conclude that this provision was intended to condemn only those forms of intimidation or harassment that threaten or endanger the health or safety of any person.

Nor have plaintiffs persuaded us that this construction of the challenged provision is so subtle or unforeseeable that students are unlikely to come to it on their own.  Rather, we believe that the limiting interpretation that we have articulated represents the most natural and likely reading of this provision — and that most college students who have occasion to consider the matter would understand that what is proscribed is intimidation or harassment that threatens or endangers health or safety.

These preliminary findings frame the issue to which we now turn: is it likely that plaintiffs will succeed in proving that a provision that bars only those forms of intimidation or harassment that threaten or endanger health or safety is facially overbroad in violation of the First Amendment?  We have little difficulty answering this question in the negative.  The arguments plaintiffs have presented thus far do not address the challenged provision as we have construed it; rather, the attacks that plaintiffs have mounted assume that the provision in question prohibits

<u>all forms</u> of intimidation and harassment.   Having proceeded on that assumption, plaintiffs' submissions are off legal target — and thus cannot be persuasive.  We cannot conclude that plaintiffs have met the burdens that they must meet in order to justify the issuance of a preliminary injunction in their favor when they have presented essentially no evidence or argument in support of the finding that the court would be required to make to grant the requested relief.

Moreover, it is far from clear that the provision in issue here would be vulnerable to a facial attack.   With its reach limited to intimidation or harassment that threatens or endangers health or safety, we are inclined to believe that the vast majority of the conduct that this provision would prohibit would not fall within the sphere that the First Amendment prohibits the government from suppressing.  Instead, it seems likely that most of the conduct that this regulation prohibits either would have no expressive component or that any such component would be so overshadowed by the risk that the conduct would cause serious harm that First Amendment concerns would have to give way.  It is difficult to imagine a substantial sphere of expressive conduct that reasonable people would conclude both (1) constituted "intimidation" or "harassment" <u>and</u>  (2) threatened health or safety but that nonetheless deserved protection under the Constitution.  Because plaintiffs have not identified any such substantial sphere, we cannot conclude that they are likely to prevail on their contention that this provision is overbroad.

It follows that the Court must DENY plaintiffs' motion for an order that would preliminarily enjoin the defendants from enforcing sub-paragraph (b)(7) of section 41301 of Title V.   It also follows, however, that that provision may be invoked only as it has been construed in this opinion.  Thus, the University may initiate disciplinary proceedings based on sub-paragraph (b)(7) only when it would be reasonable to conclude that the conduct in which a student apparently has engaged threatened or endangered the health or safety of any person in the University community.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**(c)**    **The Collective Responsibility Provision**
**of the Student Organization Handbook**

Plaintiffs also press an overbreadth challenge to the provision in the Student Organization Handbook that announces that "corrective actions may also be imposed upon an entire organization for individual members' actions when the behavior is <u>inconsistent with SF State goals, principles, and policies</u>."  Section on Student Group Misconduct in the SFSU Student Organization Handbook, Collective Responsibility Section (emphasis added).

The section of the Handbook that immediately precedes the section that includes this challenged provision is entitled "Policies."   Among other things, that policy-identifying section declares that "[s]tudents are expected to be good citizens and to engage in responsible behaviors that reflect well upon their university, to be civil to one another and to others in the campus community, and contribute positively to student and university life."  Section on Policies in the SFSU Student Organization Handbook.

For reasons that we hope are clear by this point, we are compelled to conclude that plaintiffs are likely to prevail on their claim that these sweeping mandates and opaque proscriptions offend the First Amendment.  The full reach and content of the University's "goals, principles, and policies" is by no means clear.   And this substantial uncertainty is exacerbated by the University's use of the word "inconsistent" in this setting.  Students might reasonably feel appreciably less confident that they could predict the kinds of conduct that would be deemed "inconsistent" with University policies than the kinds of conduct that would "violate" University policies.  Because the University so assertively communicates that its "policies" include undefined and apparently elastic mandates to "be good citizens," to "engage in responsible behaviors that reflect well upon their university," and to "be civil to one another," we conclude that there is a considerable risk that the University's trumpeted intention to discipline

31

1
2
3
4
5
6

organizations whose members offend any of these "policies" will chill to a substantial extent the exercise of expressive rights that students enjoy under our Constitution.   The real prospect of such a substantial chill of First Amendment rights compels the Court to PRELIMINARILY ENJOIN the defendants from basing disciplinary proceedings on these provisions at least until this litigation is concluded.[9]

7
8

### III.     SUMMARY OF RULINGS

9
10

Plaintiffs' Motion for a Preliminary Injunction is GRANTED in part and DENIED in part.

11
12

1.  Defendants ARE PRELIMINARILY ENJOINED from basing any disciplinary proceedings on the ground that the conduct in issue was not "civil."[10]

13
14
15

2.  Defendants also ARE PRELIMINARILY ENJOINED from basing any disciplinary proceedings on the undifferentiated ground that the conduct in issue was "inconsistent with SF State goals, principles and policies."

16
17
18
19

3.  Defendants are NOT PRELIMINARILY ENJOINED  from initiating disciplinary proceedings on the ground that the conduct in question constituted a form of "intimidation" or "harassment" that threatened or endangered the health or safety of any person within or related to the university community.   So construed,

20
21
22
23

///
///
///
///

24
25
26

[9]   For obvious reasons, it follows that our Order also must  temporarily enjoin the defendants from  purporting to base any disciplinary action on subsection (b)(16) of section 41301, which prohibits "[v]iolation of any published University policy, rule, regulation or presidential order." Cal. Code Regs. tit. 5, § 41301(b)(16).

27
28

[10]   This preliminary injunction does not prohibit the University from disciplining students for engaging in conduct that clearly would be considered "uncivil" if that conduct also violated a more specific proscription that was tailored in conformity with the First Amendment. The authority to impose discipline in any such circumstance would be rooted only in the more specific proscription.

sub-section (b)(7) of the Standards of Student Conduct, section 41301 of Title 5, may serve as the basis for initiating disciplinary proceedings and for imposing sanctions.

IT IS SO ORDERED.

Dated:   November  19, 2007

_____
WAYNE D. BRAZIL
United States Magistrate Judge